WILLIAM BACHMAN AND WILLIAM J. GIBNEY, PROSE-
CUTORS, v. THE INHABITANTS OF THE TOWN OF
PHILLIPSBURG AND CHARLES FOLK.

Argued June 9, 1902—Decided November 10, 1902.

1. An ordinance of the town of Phillipsburg, passed by the common
   council under due legislative authority, and providing that no
   license to keep a beer saloon shall be granted by the common
   council unless the application therefor shall be signed by a ma-
   jority of householders, being heads of families, residing within a
   prescribed distance from the proposed saloon, is, while unrepealed,
   binding upon the action of the common council itself, so that it
   imposes a condition precedent, without compliance with which the
   common council has no jurisdiction to grant such a license.
2. Such an ordinance is analogous to statutes that require previous
   consent of citizens or property owners; the signatures required
   are, in effect, votes in favor of the proposed license.
3. With respect to the votes necessary to confer jurisdiction upon
   the common council, the application must speak as of the time
   when the common council assumes jurisdiction; prior to that time
   names may be added or withdrawn; after that time the applica-
   tion is not subject to such change.
4. The applicant for license, shortly before making his application,
   and in contemplation thereof, procured two persons to take quar-
   ters in apartments fitted up by him in the same building with the
   proposed saloon, for the sole purpose of qualifying these two per-
   sons as "signers," under an ordinance that required the approving
   signatures of "householders, being heads of families." *Held*, that
   the conduct of the applicant was a fraud upon the common council
   and upon the citizens whose voices were entitled to be heard under
   the ordinance, and that the two persons in question cannot be
   treated as being householders and heads of families, within the
   meaning of the ordinance.
5. The prosecutors having seasonably presented to the common coun-
   cil a remonstrance against the proposed license upon substantially
   the same grounds that have been successfully urged in this court,
   and the common council having refused to grant a hearing upon
   the remonstrance, the license is set aside, with costs.

On *certiorari.*

Before Justices DIXON, HENDRICKSON and PITNEY.

For the prosecutors, *Osiris D. McConnell* and *Sylvester C. Smith.*

For the town of Phillipsburg, *J. I Blair Reiley.*

For the defendant Charles Folk, *Irwin W. Schultz.*

The opinion of the court was delivered by

PITNEY, J.   This *certiorari* brings up for review a license granted by the common council of Phillipsburg to Charles Folk on April 9th, 1902, to keep a beer saloon upon the premises Nos. 22 and 24 North Main street, in that town.   The *status* of the prosecutors is not in doubt.   They are residents and taxpayers and entitled to be heard here upon any matter that affects the jurisdiction of the common council to grant the license.   *Dufford* v. *Nolan,* 17 *Vroom* 87; *Austin* v. *Atlantic City,* 19 *Id.* 118; *Dufford* v. *Staats,* 25 *Id.* 286; *Middleton* v. *Robbins, Id.* 566.

By the revised charter of the town (*Pamph. L.* 1872, *pp.* 478, 487, *art.* 3, § 5, ¶ 19) the common council is empowered to pass and enforce by-laws and ordinances to license and regulate or prohibit inns and taverns and beer saloons, and to prohibit all traffic in, or sale of, intoxicating drinks without license.   Pursuant to this authority the common council, on June 22d, 1874, adopted an ordinance, known as "Ordinance Number 23," which, admittedly, was in force at the time of the proceedings now under review.   It provides in section 1 that no license to keep an inn or tavern or beer saloon shall be granted by the common council unless the application therefor shall be signed by a majority of the householders, being heads of families, residing on both sides of the street on which the proposed inn or tavern or beer saloon is situate, for a distance of three hundred and fifty feet each way along said street from the proposed inn or tavern or saloon.   By section 2 it is provided that in case the inn or tavern or saloon petitioned for shall be situate upon any street not affording a distance of three hundred and fifty feet each way therefrom, the petition shall be signed by a majority

of such householders residing within a radius of three hundred feet therefrom. By section 3 it is ordained that in case there shall not be twelve householders residing within the distance required by either of the above sections, the application shall be signed by a majority of the householders and property owners embraced within that distance.

The license in question was granted by resolution of the council, passed in supposed pursuance of the ordinance and without attempt to repeal the latter. Unless the ordinance was complied with, the common council had no jurisdiction to grant the license. *Warren Street Chapel* v. *Excise Commissioners*, 27 *Vroom* 411. The scheme of the ordinance requires that an applicant shall first obtain the approving votes of a majority of one or the other of the limited tribunals specified, without which the council shall have no power to take cognizance of his application. The ordinance in this respect is analogous to those statutes that require previous consent of citizens or property owners as a condition precedent of municipal action. Statutes of this character were discussed in the cases of *Orcutt* v. *Reingardt*, 17 *Id.* 337; *Biddle* v. *Riverton*, 29 *Id.* 289; *Hutchinson* v. *Belmar*, 32 *Id.* 443; *Currie* v. *Atlantic City*, 37 *Id.* 140.

The principal ground of attack upon the present license is that the application did not bear the requisite signatures to evidence local approval as contemplated by the ordinance.

The case shows that North Main street, upon which the saloon is situate, runs in a northerly and southerly direction, and extends for more than three hundred and fifty feet to the north of the saloon, but does not extend (under that name) for a distance of three hundred and fifty feet in a direction south of the saloon. There is a continuous street extending to the south for that distance, but the southerly portion of it is called Union square. We deem the name of the street to be immaterial, and, under the evidence, find the saloon to be situate upon a street that does afford a distance of three hundred and fifty feet each way from the saloon. Therefore section 2 of the ordinance has no bearing upon the case, and the first question is whether the application was approved by

a majority of those persons indicated in section 1 of the ordinance; the next question being whether the total number of persons thus indicated was as great as twelve.

The evidence shows, and it is admitted, that there were at least ten householders, being heads of families, residing within the distance of three hundred and fifty feet each way along the street on which the proposed saloon is situate. Their names are Cornelia Stone, John Gordon or his wife, John C. Kisselbach, Kate Styres, Joseph H. Gledhill, Nicholas Gibney, A. O. Myers, William Cole, Elmer Sheets and Rynier R. Pickel. The names of both Gordon and his wife appear upon the application. The genuineness of Gordon's signature is disputed, but Mrs. Gordon's signature is undisputed, and it is a matter of doubt, upon the evidence, whether she was not at the head of the family at the time the application was signed. Manifestly the names of the husband and wife would, at most, count only one. The other undisputed signers are Kisselbach, Cole, Stone and Pickel, making five in all. Gledhill also signed the application, but before it was presented to the common council he withdrew his name. After the council had assumed jurisdiction of the application Gledhill sought to have his name restored to the application. But this is inadmissible. The proceeding is a *quasi* judicial proceeding, in which citizens and taxpayers are entitled to be heard. It has been held that the votes necessary to confer jurisdiction may be withdrawn at any time before jurisdiction is acquired, but not thereafter, and that a change in the *status* of a voter sufficient to disqualify him is of no consequence if it take place after the vote has been given and jurisdiction thereby conferred. *Orcutt* v. *Reingardt, Biddle* v. *Riverton, Hutchinson* v. *Belmar, Currie* v. *Atlantic City, ubi supra.* It would be contrary to the spirit of these decisions and highly mischievous to permit an amendment of the vote, in the effort to bolster up the jurisdiction, after the jurisdiction had once been assumed. We hold that the application must speak as of the time when it is officially presented to the council and official cognizance is taken of it. Prior to that time names may be added or withdrawn. After that time the application

is not subject to such change. A similar view is taken with respect to remonstrances when, by statute, they are made to oust the jurisdiction of the municipal council. *Jersey City Brewery Co.* v. *Jersey City,* 13 *Vroom* 575; *Vanderbeck* v. *Jersey City,* 15 *Id.* 626; *Roebling* v. *Trenton,* 29 *Id.* 40.

The proofs in the present case show that, at a meeting of the council on March 17th, 1902, and before Folk's application was presented to the council, Joseph H. Gledhill withdrew his name by a written communication presented to, and received by, the council. Later in the same meeting the application of Folk was presented and was referred to the appropriate committee. At the meeting of April 9th, after a remonstrance had been presented to the council against the granting of Folk's license, based, in part, and indeed principally, on the ground of want of jurisdiction because the application was not signed by the requisite number of persons, under the terms of the ordinance, a communication was received from Gledhill asking the council to permit his name to remain upon the application. Later in the same meeting the Folk application was taken from committee and granted. It is plain, under this state of facts, that Gledhill's vote is not to be counted in favor of the application.

This leaves the application without a majority of the ten householders and heads of families above referred to. But it bore three additional signatures, those of Thomas Newman, Annie Gabert and Emma Smith. Their signatures are undisputed. If they, or any two of them, were householders and heads of families residing within the specified distance, their names, with the names of the admitted signers, would constitute a majority of the householders, being heads of families, residing within the distance. And in the same event the number of such householders residing within the distance is increased to twelve, and section 3 of the ordinance has no applicancy.

Newman was undoubtedly a householder and the head of a family, but the evidence shows that he resided, not on the street on which the saloon is situate, but upon Washington

street. He was not, therefore, among the number whose voices were entitled to be heard, according to the first section of ordinance No. 23. As to Mrs. Gabert and Mrs. Smith, the evidence renders it clear that they were not either householders or heads of families. Each of them lived alone in a small apartment rented of Folk, upon the second story of the building in which the proposed saloon is situate. These apartments were fitted up and the women installed therein by Folk a short time before his application was signed. His purpose was to qualify them as "signers," so that there might be deemed to be twelve or more within the distance mentioned in the first section of ordinance No. 26, that he might have a majority of the qualified signers within the purview of that section, and might, at the same time, evade the provisions of the third section. His conduct was a fraud upon the common council and upon the citizens and property owners for whose protection the ordinance was adopted, and whose voices, by its terms, were entitled to be heard. The names of Mrs. Gabert and Mrs. Smith add nothing to the application. *Smith* v. *Elizabeth,* 17 *Vroom* 312; *Austin* v. *Atlantic City,* 19 *Id.* 118.

It will thus be seen that there were only ten householders, being heads of families, within the distance of three hundred and fifty feet measured each way along the street from the proposed saloon. Even if Thomas Newman could be counted there would be only eleven. This situation calls into operation section 3 of the ordinance requiring the application to be signed by a majority of the householders and property owners embraced within the distance. As we construe that section, it does not require a majority of the householders and also a majority of the property owners, but contemplates that of the aggregate number of householders and property owners a majority shall sign. In addition to the householders already mentioned, there were seven property owners within the limit, making the aggregate number whose voices were entitled to be heard seventeen. As none of these additional property owners has signed, there is, of course, not a majority of the householders and property owners embraced within the distance.

If the name of the street had been deemed essential, and Union square were not to be treated as a part of the same street with North Main street, then the street would be one not affording a distance of three hundred and fifty feet each way from the saloon, the provisions of section 2 of the ordinance would apply, and the petition would require the signatures of a majority of the householders, being heads of families, residing within a radius of three hundred feet from the saloon. The case shows that within that radius there were seventeen householders, being heads of families, of whom less than one-half signed the application, so that, in this event, as well, the application conferred no jurisdiction.

For these reasons the license must be set aside.

An additional reason is assigned by the prosecutor, viz., that upon the presentation of Folk's application to the common council, a remonstrance, signed by the prosecutors and others, was presented against the granting of the application, and that a hearing upon this remonstrance was demanded of the council and by them refused. It does appear that before action was taken upon the license the remonstrance was presented, and that it was presented at the earliest practicable opportunity. A representative of the remonstrants also appeared before the common council and asked them to fix a reasonable time for a hearing and requested subpoenas for witnesses. This was on April 9th. The proof shows that in response to this request the president of the council announced that all parties appearing for and against the application would be given a hearing immediately, and that the council would sit all night, if necessary, in order to afford all parties an opportunity to be heard. But the requested adjournment and process for the summoning of witnesses were refused. The charter of Phillipsburg authorizes the common council to take evidence under oath and to compel the attendance of witnesses. *Pamph. L.* 1872, *p.* 511, *art.* 8, § 2. There was, we think, a substantial denial of a reasonable hearing to the remonstrants. *Dufford* v. *Nolan,* 17 *Vroom* 87; *Brown* v. *Matthews,* 22 *Id.* 253.

An examination of the remonstrance itself shows that it was based principally upon grounds that went to the jurisdiction of the common council to grant the license. In short, it challenged the application on the same ground upon which the license has been successfully attacked in this court. If the common council had granted a hearing, with opportunity to summon witnesses, doubtless the evidence would have shown lack of jurisdiction to entertain the application. If Mr. Folk had expressed a willingness to grant such a hearing no doubt one would have been granted. Thereby the costs of this litigation would have been saved.

For this reason the prosecutors are entitled to their costs.