STATE EX REL. HARRY H. PETERSON v. CITY OF FRASER AND OTHERS.[1]

April 27, 1934.

No. 29,605.

[1]Reported in 254 N. W. 776.

428

*Harry H. Peterson,* Attorney General, *David J. Erickson,* Assistant Attorney General, *John H. Hougen, Whipple & Atmore, C. E. Berkman,* and *Charles T. Wangensteen,* for appellant (relator below).

*Baldwin, Holmes, Mayall & Reavill* and *John M. Gannon,* for respondents.

*STONE, Justice.*

*Quo warranto* in the district court by the attorney general, challenging the validity of the reorganization of the village of Fraser as a city of the fourth class. Relator appeals from an order denying his motion for a new trial.

On the Mesaba iron range in St. Louis county the cities of Chisholm and Fraser lie adjacent to each other. The former is much the larger. As far as real estate goes, the assessed valuation of both consists largely of land upon which there are iron mines and other land containing proved deposits of merchantable iron ore. Fraser was incorporated as a village in 1923. Then or soon afterwards an attempt was made by the then village of Chisholm to reincorporate as a city of the fourth class so as to include the territory of Fraser and other adjacent lands. That effort failed.

With the acknowledged purpose of blocking if possible another Chisholm effort to absorb Fraser, the inhabitants of the latter village in August, 1931, instituted the proceeding, which was successful, to incorporate as a city of the fourth class, under 1 Mason Minn. St. 1927, §§ 1268-1271. This action challenges the validity of that proceeding and seeks ouster of the city officers who are respondents. The proceeding was commenced August 18, 1931, by a petition to the judges of the district court of the eleventh judicial district for the appointment of a board of freeholders to frame a city charter. It was signed as the statute requires (1 Mason Minn. St. 1927, § 1269) by more than ten per centum of the voters of the village. Thereupon the judges appointed a board of 15 members, each of whom had been a qualified voter of the village for at least five years. That board framed a charter which was adopted at an election September 1, 1931, called for that purpose by more than four-sevenths of the voters lawfully voting (1 Mason Minn. St. 1927, § 1285). The proceeding was completed by the filing of the duplicate certificates required by constitution (art. 4, § 36) and statute (1 Mason Minn. St. 1927, § 1285), one with the secretary of state and the other with the register of deeds of St. Louis county. City officers were not elected until early in December, 1931. There is this specific finding:

"That all said proceedings for the appointment of said board of freeholders, the framing of the proposed charter for the government of the said village of Fraser as a city of the fourth class and for the submission of such proposed charter to the vote of the people of the village of Fraser, and the adoption of such charter were initiated and carried out in good faith by the residents and voters of said village of Fraser; that the motives of the said residents and voters of the said village in initiating the said proceedings and in carrying out the same were proper and lawful; that the residents and voters of the said village of Fraser in connection with the initiating and carrying out of said proceedings were not dominated or controlled by others, and that the said proceedings were in accordance with the wishes and desires of the said residents and voters of the village of Fraser and were their voluntary acts."

The state constitution, art. 4, § 36, declares:

"Any city or village in this state may frame a charter for its own government as a city consistent with and subject to the laws of this state."

That section goes on to direct the legislature to make provision "for a board of fifteen freeholders, who shall be and for the past five years shall have been qualified voters," to be appointed by the district judges "for a term in no event to exceed six years" as a charter commission which "shall be permanent," vacancies therein to "be filled by appointment in the same manner as the original board was created." That constitutional authorization of home rule city charters has been implemented by 1 Mason Minn. St. 1927, §§ 1268-1271. Section 1268 begins thus:

"Any city or village in the state of Minnesota, whenever incorporated, may frame a city charter for its own government in the manner hereinafter prescribed."

Section 1269 directs the appointment by the judges of the district court of the judicial district in which such city is located of "a board of freeholders to frame such charter, composed of fifteen members, each of whom shall have been a qualified voter of such

city or village for five years last passed  *  *  *.  The members shall severally hold office for the term of four years, or until they cease to be such resident voters and freeholders, and vacancies in said board shall be filled by appointment of said judges for the unexpired terms."  There are other provisions not now important, except one providing that any member of the board may "be removed at any time from office" upon grounds and in the manner stated.

Practically all land within the limits of Fraser is owned by the Tubal Iron Mining Company, a subsidiary of the Oliver Iron Mining Company.  It is frankly admitted that its officers and attorneys have been behind the reincorporation of Fraser from the beginning.  Their purpose is to keep the Fraser property beyond reach of the taxing power of Chisholm.

No member of the Fraser board of freeholders owned real estate within the limits of the municipality until, in order to qualify him as a freeholder, the Tubal Iron Mining Company conveyed to each of them a small tract of vacant land within the then village.  The conveyances were gratuitous—none the less so because there was staged a sort of ritualistic but sterile proceeding whereby nominal sums of money passed from each grantee to the grantor as ostensible consideration for the grants.  The deeds were accepted by the grantees and placed on record.  Each deed passed a title in fee to the grantee.  Each grantee was by his deed vested with an estate of inheritance.  The land so gotten by each thereby became assessable for taxation in his name.

The argument for the attorney general can be adequately considered under two heads.  First, there is claim that the statute, § 1269, imposes as condition precedent to the reincorporation of a village as a city, with a home rule charter, "a freehold class of population."  The other claim is that the requirement of a board of freeholders is jurisdictional and was not satisfied.

But we first note a suggestion, not much pressed, that the proceeding was improvidently instituted by the Honorable Henry N. Benson, the predecessor in office of the present attorney general. The idea seems to be that the state as such is not interested in

what is said to be a controversy between Chisholm and Fraser, even though the former seeks merely additional property for taxation and the latter resists in the interest of the mining company. We decline exploration in that direction, for it is enough for us that the attorney general applied for the writ. If he had come into this court asking us to try the questions of fact, we might have objected that the proceeding should have been instituted in the district court. But this one was started there, and, inasmuch as the attorney general in his discretion decided that he should proceed, there is nothing for any court to pass upon as to the necessity for or policy of proceeding. In that field the discretion of the attorney general is plenary. He is a constitutional officer (Minn. Const. art. 5, § 1) and as such the head of the state's legal department. His discretion as to what litigation shall or shall not be instituted by him is beyond the control of any other officer or department of the state. 2 R. C. L. 919. Added to that is the fact that the writ of *quo warranto* is ordinarily "of right for the commonwealth." State ex rel. Hilton v. So-called "Village of Minnewashta," 165 Minn. 369, 374, 206 N. W. 455 (following State ex rel. Young v. Village of Kent, 96 Minn. 255, 264, 104 N. W. 948, 1 L.R.A.(N.S.) 826, 6 Ann. Cas. 905).

■■■ The existence of resident freeholders is not condition precedent to reincorporation of a village as a city under a home rule charter. The language of the constitution is that "any city or village in this state" may frame a home rule charter. That is plain and inclusive of all cities and villages in the state not already having a home rule charter. The statute also, § 1268, applies literally to "any city or village in the state."

But that is not quite responsive to the argument for relator which asks us to suppose that, if the framers of either statute or constitution or the authors of both, had thought of any village or city without a relatively substantial class of resident freeholders, there would be provision excepting such city or village from the operation of the law. See Riggs v. Palmer, 115 N. Y. 506, 510, 22 N. E. 188, 5 L. R. A. 340, 12 A. S. R. 819.

With us, ownership of property is not prerequisite to the right to vote or that to hold office. The theory of our governmental organization is that citizens everywhere, whether poor or opulent, with or without property, have a responsibility for the maintenance and right operation of government. Hence all voters are eligible to public office. It would be glaring contradiction of that policy if our laws, constitutional or statutory, excepted from their scope and benefit any group of citizens merely because they were without lands of their own.

The argument for relator not only opposes unambiguous phraseology in both constitution and statute but also the paramount purpose of both, that civic rights shall be neither given nor withheld because of property or lack of it. Our people have declared that "no * * * amount of property shall ever be required as a qualification for any office of public trust under the state (Minn. Const. art. 1, § 17), and that every person entitled to vote "shall be eligible to any office which now is, or hereafter shall be, elective by the people in the district wherein he shall have resided thirty days previous to such election," (Id. art. 7, § 7).

The idea that some of the inhabitants must be freeholders in order to organize or reorganize a municipal corporation is opposed not only to both language and spirit of our law but also to the historical concept of public corporations. In England "the corporation proper was not the town or place, but *a corporate body constituted within it,* with powers of jurisdiction, more or less extensive, to govern the inhabitants." 1 Dillon, Municipal Corporations (4 ed.) § 35; Id. (5 ed.) § 53. Municipal corporations are well and briefly defined as "bodies politic created to administer designated affairs in their respective areas." 1 McQuillin, Municipal Corporations (2 ed.) § 84. It is simply impossible to incorporate a mere place or tract of land. It is the residents of the area within which it is to function who constitute the corporation. Membership therein, if other requisites are present, such as right of suffrage, consists of living within the area over which the corporation has jurisdiction, "whatever may be the desire of the individual thus residing or that of the municipal or other incorporated body." 1 Dillon, Municipal

Corporations (5 ed.) § 60. Municipal corporations are created to exercise the powers of government delegated to them. Mere land cannot so function. But it may be and ordinarily is surveyed so that limits may be set to the area over which the corporation may exercise the powers of government delegated to it.

Hence, as far as statutes refer to the incorporation of mere districts or areas, they indulge in inapt language. The franchises they grant cannot and do not vest in the land within the specified area but in the inhabitants thereof qualified to participate in government. Our statute for the incorporation of villages, while it begins with the idea (1 Mason Minn. St. 1927, § 1111) that "any district, section or parts of section * * * which has been platted into lots and blocks * * * may become incorporated as a village," really means that the "resident population" may become so incorporated. And there is no suggestion here that any of them must be freeholders. Again, in the general act for the incorporation of cities of the fourth class, we find expressed the idea that the corporation shall be organized by and consist of "the inhabitants of contiguous territory." 1 Mason Minn. St. 1927, § 1828-17. There, as elsewhere, the procedure is to be instituted by a stated proportion of "the legal voters," without requirement of freehold population. Surely, if the presence of freeholding inhabitants was intended to be essential, both constitution and statute, by unequivocal language, would have required that the proceeding for incorporation or reincorporation be *initiated* by freeholders, or at least with the express concurrence of some of them. The omission of such mandate from both constitution and statute is demonstrative of the intention that neither presence of, nor action by, freeholders was to be prerequisite to the political action authorized.

Were we to hold with relator on this point we would frustrate the almost unanimous desire of the inhabitants of Fraser to conduct their municipal affairs under a home rule city charter. We would deny a right granted them in plain language of both constitution and statute. The deprivation would be upon the sole ground that they do not number enough landed proprietors. Long gone is the time when wise governments discriminate against citizens, or

any class of them however small, on that ground. That most of the Fraserites are employes of a mining company minimizes not at all their right to hold public office or to be as politically active as they like in affairs of government, particularly those of their own municipality.

If within legal limits they coöperate effectually with their employer, not to evade taxes but to avoid them as much as possible for all concerned, neither employer nor employes have done wrong. If it be properly called a "political deal," what of it? And if a corporation be party to it, nothing is added of malfeasance if no law has been violated. None has been in this case.

Corruption is not even suggested. Coercion is negatived. True, there was perfect and well thought out coöperation between the people of Fraser and the mining company, which employed most of them. Such unforced coöperation between employes and employer is generally the subject of approval rather than condemnation. It goes further than anything else to assure peace and security for an industrial population. Pity is there is not more of it.

The activity of corporations in politics is but that of the individuals interested in corporations. It too frequently denotes the pernicious activity of mere "property interests." But here the determinative activity was that of the employes themselves, without corruption or coercion. It certainly is not to be condemned because it appears to have been incidentally and much to the interest of the employing corporation. The officers and attorneys of corporations, including mining companies, are not disfranchised nor barred from political action. The coöperation of all concerned in the reincorporation of Fraser, while it has been much and eloquently denounced in argument for relator, is all within the individual political and civic rights of the actors. It has not transgressed the law. That established, the motives of the actors are irrelevant. As judges, we are not concerned with them. The judicial problem is simply this: Have they *acted* within the law? In this case the answer is affirmative.

■ Sound is the argument for respondents that members of the charter commission each hold office and that, in any event, their

actions in framing and submitting the Fraser home rule charter were those of *de facto* officers and effective as such. The statute, 1 Mason Minn. St. 1927, § 1269, makes plain the purpose to give official status to the charter commission and each of its members. Explicitly it says that members "shall severally hold office for the term of four years," and provides for their removal "from office." Thus plainly is established the status of both office and holder thereof at the time being.

There is no question as to the *de jure* character of the office. Hence there can be none as to the effect, on third parties generally and the public as a whole, of the official actions of the incumbents at the time being. 2 McQuillin, Municipal Corporations (2 ed.) §§ 153-156; 22 R. C. L. 597; 5 Dunnell, Minn. Dig. (2 ed. & Supp.) §§ 8012-8013. If land ownership were qualification for holding judicial office, which fortunately it is not, the decisions of the most landless lawyer in the state would yet be binding during his time in judicial office under color of title. State ex rel. Derusha v. McMartin, 42 Minn. 30, 43 N. W. 572; Burt v. Winona & St. Peter R. Co. 31 Minn. 472, 18 N. W. 285, 289. Compare Quinn v. Markoe, 37 Minn. 439, 35 N. W. 263 (vote of an election precinct must be counted notwithstanding judges of an election therein were judges *de facto* only, admittedly lacking legal qualification for the office). So, even if we assume that some or even all the Fraser charter commission could have been ousted by *quo warranto,* we still find no escape from the conclusion that their action in framing and submitting the city charter was valid, as that of *de facto* officers. It is so concluded. They did not adopt its charter. That was done by the nearly unanimous affirmative decision of the voters.

■ But it does not dispose of all the issues to hold that the members of the Fraser charter commission were at least *de facto* officers. That much does establish beyond doubt that their action in framing and submitting the charter is now beyond the possibility of successful attack. But the members of the commission are parties respondent, and their right to hold office is in question. If they are not qualified a writ of ouster should issue. But we think that they were, when appointed, freeholders within the meaning

of the law, however strictly it be construed as requiring the ownership of a freehold estate as qualification for the office. As already indicated, malfeasance and bad faith absent, all the parties having proceeded within the limits of law, we have but to consider the resultant fact that each of the commissioners, when appointed, was possessed of a freehold estate, "defined by Blackstone to be 'such an estate in lands as is conveyed by livery of seisin, and it may be in fee simple or conditional fee, and may be for life only.'" Hughes v. Milligan, 42 Kan. 396, 400, 22 P. 313, 314. "A freeholder is one having title to real estate, and the amount or value of his interest therein is immaterial." 3 Wd. & Phr. (1 ser.) 2969, citing People ex rel. Shaw v. Scott, 8 Hun, 566. For other and numerous similar judicial definitions in accord, see 2 Wd. & Phr. (2 ser.) 662-663; 3 Wd. & Phr. (3 ser.) 802-803; see also Pettit v. Yewell, 113 Ky. 777, 784, 68 S. W. 1075 (candidate for mayor bought for $150 a small lot so as to qualify, paid only $50 on contract. He was held a freeholder "whether he became so exclusively for a business purpose or for a political one") ; Stucker v. Beavers, 128 Okl. 228, 262 P. 212; Mayer v. Sweeney, 22 Mont. 103, 55 P. 913 (purchaser of tax title a freeholder, even though he bought it solely to qualify as such, the important thing being that he was subject to taxes on a freehold).

It is argued for the attorney general that where a proceeding is required to be initiated by, or is subject to the consent of, a specified number of qualified freeholders, "those who are made such for the express purpose of qualifying as such cannot be counted in making up the required statutory number." Thus, if an application for a liquor license is required to be accompanied by the consent or approval of a stated number of reputable freeholders, the requirements may not be met by landowners made such for the occasion and solely for the purpose of giving the application the color only and none of the substance of the approval or recommendation required. Colglazier v. McClary, 5 Neb. [Unof.] 332, 98 N. W. 670; Austin v. Atlantic City, 48 N. J. L. 118, 3 A. 65; Dye v. Raser, 79 Neb. 149, 112 N. W. 332, 16 Ann. Cas. 274. A similar holding has been made with respect to applications to run live stock at large

438

(McGraw v. Co. Commrs. of Greene County, 89 Ala. 407, 8 So. 852), and to establish drainage districts (Murdock v. Weimer, 55 Ill. App. 527). But we have here something which is at bottom a very different matter. The subject of inquiry is not the qualification for those (the original petitioners) authorized by law to institute the proceeding, but rather and only the qualifications for the holding of a public office, that of members of a charter commission. Unlike liquor license laws, the policy now determinative is not restrictive or repressive but permissive and enlarging. And the precise inquiry is not as to those (the voters) who initiate political action, but concerns only a board of officers to function in aid of the proceeding after the voters have put it under way.

Order affirmed.

*DEVANEY, Chief Justice* (dissenting).

I cannot agree. I do not question but that the steps necessary to make the village of Fraser a home rule city were meticulously met. The constitution requires freeholders. To my mind this means *bona fide* freeholders. In the case at bar the charter commissioners were not *bona fide* freeholders. We are not concerned with motives or with political controversy. We are concerned solely with the plain meaning and intent of the law. It has been held repeatedly in other jurisdictions that a person who becomes a freeholder or landowner for the sole purpose of enabling himself to sign an application, to petition for consent to the issuance of a liquor license, or to vote is not *bona fide* and hence does not qualify as a freeholder under a statute requiring freeholders. Dye v. Raser, 79 Neb. 149, 112 N. W. 332, 16 Ann. Cas. 274; Bennett v. Otto, 68 Neb. 652, 94 N. W. 807; Powell v. Morrill, 83 Neb. 119, 119 N. W. 9; Cohn v. Welliver, 84 Neb. 230, 121 N. W. 107; Marcia v. Yost, 85 Neb. 842, 124 N. W. 460; Smith v. Elizabeth, 46 N. J. L. 312, 314 *(dictum);* Austin v. Atlantic City, 48 N. J. L. 118, 3 A. 65; McGraw v. Co. Commrs. of Greene County, 89 Ala. 407, 8 So. 852; Jones v. Carver, 29 Tex. Civ. App. 268, 67 S. W. 780; Murdock v. Weimer, 55 Ill. App. 527; People ex rel. Saunier v. Stratton, 33 Colo. 464, 81 P. 245; Bachman v. Town of Phillipsburg, 68 N. J. L. 552, 557,

53 A. 620. Of interest is In re Consolidation of School Districts, 140 Minn. 475, 477, 168 N. W. 552. It seems to me impossible to distinguish the above cited cases from the case at bar.