# STATE EX REL. TOWN OF STUNTZ v. CITY OF CHISHOLM AND OTHERS.
## TOWN OF BALKAN AND OTHERS, INTERVENERS.[1]

March 19, 1937.

No. 30,809.

[1]Reported in 273 N. W. 235.

See 196 Minn. 285, 264 N. W. 798, 266 N. W. 689.

*Thomas H. Strizich, Clarence H. Kleffman,* and *R. L. Mayall,* for relator.

*John Hougen, Samuel B. Wilson, C. E. Berkman, Frank M. Talus,* City Attorney, and *Charles T. Wangensteen,* for respondents.

*William S. Ervin,* Attorney General, *David J. Erickson,* Deputy Attorney General, and *Morris Greenberg,* Special Assistant Attorney General, for the State.

*John M. Gannon, Thomas H. Strizich, Victor E. Essling, S. C. Scott, Everett Freeman, Baldwin, Holmes, Mayall & Reavill,* and *Harry C. Applequist,* for interveners.

HOLT, JUSTICE.

This is an original application in this court by the town of Stuntz, in St. Louis county, to file an information in *quo warranto* against the city of Chisholm and its officers. The application was granted and the Honorable A. B. Gislason, one of the judges of the ninth judicial district, was appointed referee to take testimony, make findings of fact, and report the same to this court. Thereupon the attorney general moved to quash the writ, and the town of Balkan and other taxpayers of that town and of the city moved for leave to intervene. The motion of the attorney general was denied, with leave to intervene, and the motions of the town of Balkan and of others to intervene were granted. State ex rel. Town of Stuntz v. City of Chisholm, 196 Minn. 285, 264 N. W. 798, 266 N. W. 689. Upon the issues raised by proper pleadings the referee

took the testimony, made and filed his findings and report, and the parties duly submitted their briefs and arguments to the court.

The findings are too lengthy to be set out in an opinion. An endeavor will be made to condense in as short a space as possible the main facts. Many exhibits, consisting of plats and photographs, were received in evidence which throw light on the conditions of the territory concerned but which cannot be reproduced in an opinion.

For many years prior to July 1, 1934, the village of Chisholm in St. Louis county had been a municipal corporation organized under L. 1885, c. 145, and amendments thereto. It embraced 2,160 acres in township 58 north of range 20 west, a somewhat irregular tract carved out of the town of Balkan. The town of Stuntz lies south of the town of Balkan and is the south boundary of the village. The south line of the southwesterly forty is also the north boundary of the village of Hibbing in the town of Stuntz. The northeasterly part of the village adjoins the city of Fraser, which escaped Chisholm by incorporating as a city. State ex rel. Peterson v. City of Fraser, 191 Minn. 427, 254 N. W. 776, 779. The platted portion of the village is confined to 600 acres in the north half of its territory, almost all in section 21.

The city of Chisholm was incorporated as a city of the fourth class under 3 Mason Minn. St. 1936 Supp. § 1828-17, et seq. (L. 1921, c. 462, as amended by L. 1931, c. 289), the proceeding being completed September 4, 1934. Thereafter a home rule charter was duly adopted, effective as of November 6, 1934. The territory embraced in the city of Chisholm was the village of Chisholm of 2,160 acres, adjacent lands of 1,720 acres or 43 forties from the town of Balkan, and 1,400 acres or 35 forties from the town of Stuntz. The territory within the incorporated city will hereinafter be referred to as the city and that within the former village as the village. There are indications of iron ore underlying part of the platted portion, but, except for that already mined, it is of doubtful minable worth. The territory south and east of the platted part of the city is underlaid with minable iron ore which has been and is being mined. In the city joining the southwest corner of the village three forties

to the west are taken from the town of Balkan, and three forties immediately south of them are taken from the town of Stuntz. The three latter join the village of Hibbing. All six are being mined. To better elucidate the situation a map is attached. It does not purport to be an exact copy of any exhibit, because the contour of the ground is not shown nor the railroad tracks. It represents the limits of the village by slanting lines through the forties therein situate, the forties taken by the city from the town of Balkan by dots, and the forties taken from the town of Stuntz are shaded. The main highways are shown, but their width is out of proportion.

LEGEND

▨ Limits of Village of Chisholm

▦ Proposed Annexation from Town of Balkan

▦ Proposed Annexation from Town of Stuntz

The referee, in paragraph 4, finds, in substance, that the territory immediately south and east of the platted part of the village

was underlaid with iron ore, and extensive mining operations have been conducted so that in the village there is an extensive area of open pits, mining dumps, and caved ground, extending in an almost unbroken line from the west side of section 29 to the middle of section 27, a distance of about 2½ miles, and varying from half to three-fourths of a mile in width, which separates all the land to the south, including the land taken from the town of Stuntz, from the platted part of the city in such a manner as to leave no practical connection between them. The lands thus without connection and included from the town of Stuntz are 32 forties in sections 33, 34, and 35, consisting of cutover lands traversed by stripping dumps, railroad tracks, and spurs. The 32 forties are uninhabited except for one squatter. This territory embraced in the city from the town of Stuntz is not urban or suburban in character, and no reason exists to believe it will become so in the future. It has no natural connection with the platted portion of the city and no unity of interest with it, it is nonagricultural, consisting of reserve ore in mines which will in the future become active and developed mines.

In paragraph 5 the referee finds in respect to the 25 forties taken from the town of Balkan east of the village limits that the same are similar in character to the land described in paragraph 4 and covered with dumps, pits, railroad track, and spurs and overgrown with brush and second-growth timber. He finds that there is one operating mine and some 15 or 20 houses at the Dunwoody location in section 27, occupied by 75 to 100 inhabitants; that considerable of this area is underlaid with iron ore; that it is not urban or suburban in character, nor is there any reason to believe that it will become such in the future; that it has no natural connection or community of interest with the platted portion of the city; and that one forty is a farm, the balance is mining and nonagricultural land.

The sixth paragraph of the findings deals with three forties extending west from the southwest corner of the village along the south boundary of the town of Balkan and the three forties directly south of them taken from the town of Stuntz. The village of Hib-

bing adjoins the three forties in the town of Stuntz on their south and east sides. Of these six forties the referee finds that they consist of caved ground, pits, and stripping dumps, the nearest point being more than one-half mile from platted territory; that they are separated from the platted portion by pits, caved areas, and dumps, and are not urban or suburban in character nor likely to become such in the future, and have no natural connection or community of interest with the platted portion of the city. There are three active mines operated by men residing mostly in the platted part of the city. Before the incorporation some 75 inhabitants were living at the Alexandria location on one of these forties, but thereafter a substantial part of the inhabitants and houses moved to the platted part of the city.

Concerning the 15 forties to the west and north of the village which are embraced within the city, the referee finds, by paragraph 7, that they are adjacent to the platted portion of the village and some of them are platted and suburban in character, and, considering that territory alone, "it cannot be said that it is not so conditioned as to be subject to municipal government, though no particular need for municipal government appears."

With respect to the territory described in paragraphs 4, 5, and 6, the referee, in paragraph 8, finds:

"No need appears for municipal service or improvements, and no likelihood appears that such will be needed or furnished in the future. Practically all of said territory is uninhabited, and the indications are that it will continue so to be. No reason appears on account of working conditions or otherwise for extending municipal control or regulation over mining operations in said territory. So far as appears, such regulation or control has not been exercised in the past by the Village of Chisholm or other range municipalities. The matter of sewage disposal from the inhabited portion of the incorporated territory does not create a need for municipal government in said territory, and no problems of police or fire protection are presented therein other or different from those in the ordinary uninhabited or sparsely inhabited territory outside of

municipalities. The territory in said paragraphs 4, 5, and 6 described has no such natural connection or unity of interest with the platted and occupied portion of the incorporated territory as to be proper for inclusion in the municipality; with such territory included, the incorporated territory as a whole is not so conditioned as to be properly subjected to municipal government."

The ninth paragraph is to the effect that the village had decreased in population from 9,039 in 1920 to 8,520 in 1934. Outside the village but within the city lived about 300 in 1934. Due to improvements in mining methods and increased use of machinery, substantially fewer men are employed in the mining industry than formerly. The indications are that the population of the territory involved will decrease in the future.

In the tenth paragraph the referee finds that of the village 2,160 acres about 600 acres were platted. The land in the unplatted part was available for building purposes, if needed. Of the 2,160 acres in the village, 240 acres are water—Longyear Lake. The remainder of the unplatted village land, southerly and easterly of the platted, consists for the major part of mining and industrial territory, active and reserve mines.

Paragraph 11 is to the effect that due to better roads and improved transportation means workmen in the mines are not required to live as close to mining operations as formerly. Most of the persons working in the mines within the city live within the village limits and do their trading there. In the city are mining locations, to-wit: Shenango, Monroe, connected by highway, and Dunwoody, also so connected.

In paragraph 12 the referee finds that about half of the platted portion of the city overlies ore formations, having commercial ore assessed at a valuation of $7,000,000 by the tax commission (White Iron Mine in section 21).

Finding 13 is that the assessed valuation in 1933 for the village was $13,897,137, of which amount $12,772,235 was for iron ore and $1,124,902 on all other property in the village. In 1934 it was $4,396,813 in the city outside the village. Of said amount,

$4,320,800 was the value of iron ore property and $76,013 on other property. Of said $4,396,813, $1,292,172 was property in the town of Stuntz and $3,104,641 in the town of Balkan. The total assessed value for the city in 1934 was $18,283,687. The tax levy in the village for 1930 was $562,020.76; for 1931 it was $570,198.97; for 1932 it was $549,694.37; for 1933 it was $561,166.39. In 1934 for the city it was $806,310.60, and in 1935 it was $851,035.59.

In paragraph 14 the referee finds that the motive for incorporation as a city was the inclusion within it of mineral lands which were outside the village so as to obtain additional taxes therefrom. By 14B it is found that in its pleading the town of Balkan admitted that territory within sections 26, 27, and 29 was urban or suburban and suitable for municipal government. But that fact was put in issue by other interveners, taxpayers, and residents of the town of Balkan, so the findings made must override the admission of the one intervener.

The remainder of the findings relate to the defense that the state is estopped to question the validity of the city incorporation and that the adoption of the home rule charter made its existence as a city of the fourth class free from attack; as to which the referee finds, in substance, that prior to any proceeding to incorporate the city the village applied to the state board of investment for a loan of $60,000 to refund bonds falling due September 1, 1934. The application was duly granted, and in October, 1934, the state warrant for the loan was issued payable to the village. All proceedings in respect to this loan were in the name of the village. In the fall of 1935 the city applied to the state board of investment for a loan of $1,000,000 to refund outstanding certificates of indebtedness. On February 5, 1936, after this court had issued the writ herein and service thereof had been made on the city, the application was considered by three members of the board of investment and granted. This loan was granted in good faith on the opinion of the attorney general. It is also found that the city adopted a home rule charter and has functioned as a city since its organization. Among other matters it vacated a highway within the city limits. It has been sued and judgments rendered against it.

The first proposition is: What effect is to be given the findings of the referee? It is true that they are not to be considered as conclusive as are on appeal the findings of fact of a trial court. But the findings of fact reported by a referee appointed in virtue of 2 Mason Minn. St. 1927, § 9317(4), are, by § 9319, to have the effect of a special verdict. Frankman v. Bolduc, 179 Minn. 175, 228 N. W. 614. To such findings either party may take exceptions. Respondents do so here. Such exceptions prevail if the evidence does not sustain the findings excepted to. Respondents call attention to this in 53 C. J. p. 762, § 188:

"Findings of fact that are mere inferences from other facts found are not binding upon the trial court and are not entitled to any greater weight than findings of law."

Certain Pennsylvania decisions and one from Vermont are cited in support of the text. In McConomy v. Reed, 152 Pa. 42, 44, 25 A. 176, after stating that a master's findings on conflicting evidence are as binding as the verdict of a jury, the court says:

"If, however, his finding is a deduction from undisputed facts, or from uncontradicted and credible evidence, the controlling reason for the application of this principle is not present, because in such case he has no greater facilities for reaching a correct conclusion than the court has in passing upon the exceptions to his report."

We may accept the quoted statement as a correct view of the law. But this does not mean that a referee appointed under § 9317 may not find upon every issue raised by the pleadings, even though such ultimate issue is to be deducted from many facts as to which the evidence may be in conflict. We discover no finding of the nature of a legal conclusion.

The real issue raised by the pleadings herein is whether the 35 forties taken into the city from the town of Stuntz and the 43 forties from the town of Balkan are not fit and proper for city government and have not such connection with the village proper as to be suitable to become a part of one city. That all the territory within the village limits could lawfully be incorporated into a city of the fourth class must be conceded, for the village has

existed as a municipal corporation for such a length of time that neither the state nor anyone else can question the suitability of any portion of its territory for municipal government. And we do not think that either relator or any intervener makes any point as to the validity of the city incorporating all the territory of the village. There can be no doubt that the people of the village had the right to incorporate its entire territory as a city of the fourth class and adopt a home rule charter. The incorporation proceedings are not questioned nor the validity of its home rule charter. The only controversy is the inclusion within the city of territory taken from the towns of Stuntz and Balkan.

The statute (§ 1828-17) states:

"That inhabitants of contiguous territory not organized as a city and having not less than one thousand (1,000) inhabitants nor more than ten thousand (10,000) inhabitants, may become incorporated as a city of the Fourth Class as hereinafter provided."

There is in this law no limitation as to area or condition of the territory that may be included. But in the nature of things there must be a limit to the territory which may be incorporated as a city under any law. The question arose in State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 186 N. W. 694, 695, 189 N. W. 592, 593. On the first hearing the constitutionality of the law was attacked on several grounds, one of which was that no limitation as to area was placed by the legislature as to the territory the voters might embrace within such city. The fourth paragraph of the syllabus is: "The act authorizes the incorporation only of territory urban in character." There was a hearing on the merits, after an amendment of the information and testimony submitted upon the issue raised by the pleadings as to the character of the territory included, and the court reached the conclusion that the territory subject to be embraced in a city of the fourth class must be urban in character and properly conditioned for municipal government. It was further said [151 Minn. 545]:

"We have recognized that there is a difference between a village in a mining country and a village in an agricultural community;

and that the question whether the territory is so situate as properly to be subject to village government is primarily a legislative one for the voters, to whose determination the court defers, but subject nevertheless to the conditions under which incorporation is authorized by the legislature."

The territory included in the city of Nashwauk was over 7,000 acres, about two miles square of which was a compact body constituting the village of Nashwauk. The territory additional to the village in that case was similar in character and condition to that described in findings 4, 5, and 6 by the referee herein. The court in the Nashwauk case continues [151 Minn. 549]:

"The organization of municipalities is legislative in character and primarily for the voters to whose views courts somewhat defer. It is not, however, a matter of unrestricted legislative discretion resting with the voters. It is a fundamental requirement that the territory incorporated be so conditioned as to be subjected properly to municipal government. * * * When this question is presented it is for the court to speak. Often it has spoken adversely." Citing the cases.

And it was also stated that there must be a community or unity of interest between the people in the territory so that the whole thereof is so conditioned as properly to be subjected to municipal government. In the city of Nashwauk case two nuclei of population were attempted to be included. Here there is only one, the village.

The main attack of respondents is upon the fourth, fifth, sixth, and eighth paragraphs of the findings, and particularly those portions finding that the 35 forties taken from the town of Stuntz and the 28 from the town of Balkan, three west of the southwest corner and 25 east of the village, were not urban in character, had no natural connection or community of interest with the platted portion of the city either now or in the future, and that there was no need for municipal government in this territory of 63 forties. A perusal of the testimony and an examination of the maps, photographs, and exhibits will convince any reasonable mind that the

findings mentioned as attacked are well sustained in every particular and are the only conclusions and deductions that properly can be made. Able lawyers representing all parties went minutely into existing conditions and future problems of the territory described in the fourth, fifth, and sixth paragraphs. Photographs were received of every forty taken from the town of Stuntz (several views of almost every forty). Photographs were introduced of the residence part, and several views of the territory of the city taken from airplanes passing over it in various directions. Some of the open mine pits are over 300 feet deep, and some of the dumps are over 125 feet high. It is estimated that the dumps in the city contain as much material as was moved in digging the Panama Canal. The caved land above underground mines varies from depressions of a few feet to 75 feet. Experts, mining engineers, and city planners were heard. Evidence was received as to sanitation, including sewage disposal and water supply, police and fire protection, roads and electrical energy, and, to a certain extent, as to the supervision by the city of the mining industry and the care and storage of explosives, the caving of underground mines and of control of open pits and dumps. The claim for municipal regulation of the mining industry cannot be given much weight in view of the state inspection provided by 1 Mason Minn. St. 1927, §§ 4233 to 4245, inclusive. The matter of assessed values, taxation, and finances were all gone into, and the evidence in respect thereto is practically without conflict.

Whether territory is urban or suburban in character is surely one of fact, and certainly it cannot with reason be claimed that the iron ore land south and east of the village is urban or suburban. The 1,400 acres taken from the town of Stuntz had only one inhabitant, a squatter. Territory cannot be urban which has no population nor likely to have in the future. There is ample room in the village limits on the platted ground for industrial, business, and residence purposes of an ordinary city; in fact, the population is on the decrease. If any territory is needed for the usual suburban purposes, it appears to be land west and north of the platted part. The benefits from city or municipal government go to the

inhabitants thereof, not to the owners of the land other than that occupied for residence or business. Of course, to a certain extent, where, as in the past, "locations" were established at a mine, open or underground, some benefits from municipal government would be conferred on the community living in the locations. But it appears that as the mining industry has advanced means of transportation have been improved so as to do away with "locations," the men working in the mines living in the platted portions of the municipality and being transported to and from their work every day. But, even so, we have recognized that mineral lands are somewhat different from agricultural lands when the question is their suitability for municipal government and inclusion in a city or village. The iron ore of the Mesaba range caused the cities and villages now thereon to spring into being. So some of the lands bearing such ore are so contiguous to the inhabited portions as properly to be a part of a city or village and subject to bear the burdens of municipal taxation. This has been taken into consideration by this court in State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 127 N. W. 1118; State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951; State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 178 N. W. 815; State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 184 N. W. 850. It is to be noted, however, that some of these cases arose at a time when there was a rapid growth of the population of the municipality involved, and not, as in the instant case, when the population is dwindling. Much is made of the fact that mining is an industry, and hence ore land is industrial territory and for that reason proper to include in a city. A city or a village is understood to have for its nucleus a comparatively compact body of people, residing on platted ground, where the homes, industries, and business locations are so close together that many conveniences like water, sewers, gas, and electricity can readily be made accessible to all under a common government, which may also enact and enforce rules and ordinances for the peace and good order of the people within its borders. Such a body may, under the law, include in its incorporation additional contiguous land not only for reasonable anticipated growth,

but also, we think, for protection. However, iron ore lands should not be regarded in the same light as other industries which grow up with a municipality, such as factories. The latter are erected for permanent use at no great distance from the homes of the people and to a certain extent partake of the same conveniences as are supplied to the homes, and the surface of the land remains practically uniform. Whereas, when the iron ore is removed from the ore-bearing lands on the Mesaba range they become wholly worthless. The mining industry is gone. No part of exhausted mining lands is desirable for platting or for any suburban use. It is good for neither man nor beast. Within reasonable limits, mines and ore lands may be included in a municipal corporation; but when it comes to reaching out at great distances and over exhausted or nearly exhausted mining areas to extend the limits of a municipality whose inhabitants are on the decrease and for almost 30 years have felt no need of more territory, there is good reason for questioning the right so to reach out.

Another finding to be considered, in connection with the incorporating into the city territory additional to that in the village, is the one as to the real motive for so doing. The city embraces more than twice the territory that had been deemed and was adequate for village purposes. The finding is that the motive for incorporating the city so as to include ore lands outside the village was to obtain additional revenue for the city. The finding is not disputed and could not well be. A mere cursory consideration shows conclusively that these lands south and east of the village were included for no other purpose than the revenue the city could obtain from their taxation. They never can be used for permanent building purposes. Any mining structures placed thereon will be but for temporary use while mining is going on. There is no community or unity of interest, so far as concerns municipal government, between the inhabitants of the city and the owners or occupants of these lands. The lands merely furnish a place for work. Respondents contend that the mining industry by the five active mines located outside the village and that likely in the future upon the

lands south and east of the village create a unity of interest with the population within the village. It may be true that unless the mining industry can be carried on the inhabitants of the city proper will fare badly. But that does not mean that there is any unity of interests between these lands or their owners and the inhabited portions of the city calling for the same municipal government. We think the referee's findings are right. There certainly is no unity of interests insofar as concerns the taxing of these distant, uninhabited ore lands for the usual benefits which the body of the inhabitants of a village or city receive from municipal government. The town organizations affected have some rights also to be considered. They have governmental expenses and duties, among which are the upkeep of roads, and must have taxable lands within their territory from which to derive their revenue.

From the town of Balkan two factions intervened. One adopted the pleading of relator, and the other, which the referee held to be the true representative of the town, admitted that all territory incorporated into the city from the town was urban and suitable for city government. It is asserted that this admission in the pleading is conclusive. We think not. The finding of the referee is to the contrary. Other residents and taxpayers in the town of Balkan were given the right to intervene. They did so and alleged the facts in main as found by the referee.

The respondents and the attorney general urge laches, waiver, and estoppel. We see no merit in the claim of laches. The town of Stuntz petitioned the attorney general to institute this proceeding September 10, 1934, but no action was taken until November 14, 1935, after the town of Stuntz moved this court for leave to file the information herein. State ex rel. Town of Stuntz v. City of Chisholm, 196 Minn. 285, 264 N. W. 798, 266 N. W. 689. The loan of $60,000 by the state board of investment to the village to refund its debt cannot possibly serve as a waiver or estoppel in favor of respondents. And no good reason appears to us for holding that a waiver or estoppel can be predicated upon the negotiation by the city of the $1,000,000 loan to refund outstanding certificates of indebtedness. The board granted it with knowledge of the pendency

of these proceedings. The attorney general, a member of the board, gave his opinion that the city was legally incorporated as a city of the fourth class with a home rule charter, and that the decision of this court on the application of the town of Stuntz for leave to file an information herein was not a final adjudication of the validity of the city's incorporation. We do not think the investment board was misled. It acted with full knowledge that this proceeding was pending. Moreover, it is not likely that the state will be prejudiced so far as the safety of the loan goes. State ex rel. Douglas v. School Dist. No. 108, 85 Minn. 230, 88 N. W. 751, is relied on by respondents, but the situation was different from the one now before us.

There is some claim that parties sued and obtained judgments against the city and that it vacated a part of a public road within its borders. We see nothing in all this to estop the parties permitted to prosecute this proceeding from questioning the act of incorporating land neither urban nor suburban in character nor suited to municipal government.

Some rulings of the referee are challenged, particularly because of the denial to open the proceeding so as to show that the town of Stuntz did not originally authorize the institution of this proceeding but ratified it by resolution of February 10, 1936. We think the referee ruled properly. The rulings were more than liberal to respondents. We have a record of nearly 1,000 large typewritten pages, besides numerous maps, photographs, and documentary exhibits, so that it cannot well be said that the referee and the court lack information.

Respondents insist that the home rule charter and a zoning ordinance adopted pursuant thereto preclude inquiry as to the legal existence of the city. As far as managing the affairs of the city, the home rule charter may be said to be as binding as an act of the legislature. But the charter cannot make the territory included in the city urban and suitable for city government, if it is not such in fact, any more or any better than would an incorporation as a city of the fourth class under § 1828-17, et seq.

As already stated, the voters had the perfect right to incorporate the village as a city of the fourth class regardless of whether the territory therein was all suitable for municipal government. And from the seventh paragraph of the finding the court should defer to the decision of the voters that the territory comprised of the 15 forties adjacent to the north and west side of the village is suitable for municipal government. With some hesitancy we conclude that the decision herein on the findings of the referee, which we approve and adopt, should go no further than ousting the city and its officers from exercising jurisdiction over the territory unlawfully taken from these towns. This will leave matters just as if the village after incorporating as a city had proceeded to annex what the city here attempted. *Quo warranto* then would affect only the parts unlawfully annexed. State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 184 N. W. 850. It may be claimed that the voters may not have incorporated the city if they had known that the courts possessed the power to deprive it of part of the territory selected. But it is to be assumed that the main purpose of the voters, in whose hands the legislature vested the right to organize a city, intended to include only such territory as lawfully might be included. They practically all were residents of the village functioning as a municipality, but wished to change that into a city of the fourth class. They were so situate that the statute gave them the right to do so. However, they had no right to confer a city government upon any particular area or district they selected. Speaking of the wording of municipal incorporation laws, the court in State ex rel. Peterson v. City of Fraser, 191 Minn. 427, 434, 254 N. W. 776, said:

"Municipal corporations are created to exercise the powers of government delegated to them. Mere land cannot so function. But it may be and ordinarily is surveyed so that limits may be set to the area over which the corporation may exercise the powers of government delegated to it. Hence, as far as statutes refer to the incorporation of mere districts or area, they indulge in inapt language. The franchises they grant cannot and do not vest

in the land within the specified area but in the inhabitants thereof qualified to participate in government."

In this case it is not the state by its attorney general seeking to oust the city of Chisholm as a legal entity, but it is relator and interveners and landowners of the town of Balkan asking the court to oust the city of territory unlawfully included in the city. It seems to us that there is no occasion to disturb the existence of the city or its officers except as to the specific 63 forties included in the fourth, fifth, and sixth findings of the referee. As to that territory, it should be restored to the respective towns and judgment of ouster entered against the city and its officers. By so doing the city of Chisholm will continue to exist, having a home rule charter with enlarged power to tax, a belated zoning ordinance, enforceable judgments, whether obtained by consent or otherwise, and a vacated highway and other city doings unquestioned.

Let a judgment be entered against respondents, the city of Chisholm and its officers, ousting it and them of all jurisdiction and authority over all the territory in the town of Stuntz and as to the 25 forties in the town of Balkan lying east of the village limits, and the three forties therein extending west from the southwest corner of the village and lying in section 29.

MR. CHIEF JUSTICE GALLAGHER and MR. JUSTICE PETERSON took no part in the consideration or decision of this case.