## STATE EX REL. J. A. A. BURNQUIST v. VILLAGE OF LEETONIA AND OTHERS.[1]

June 13, 1941.

No. 32,423.

[1]Reported in 298 N. W. 717.

*J. A. A. Burnquist,* Attorney General, *Hayes Dansingburg* and *M. Tedd Evans,* Assistant Attorneys General, and *Clarence H. Kleffman,* for relator.

*Naughtin & Henley,* for respondents.

HILTON, JUSTICE.

On *quo warranto* to contest the incorporation of the village of Leetonia, located about half a mile west of the village of Hibbing in the county of St. Louis, the matter was referred for hearing of testimony and findings of fact. The case now returns for final consideration in which we must decide whether the incorporators have included unplatted areas unsuitable for municipal purposes.

Since an election held December 5, 1939, at which 99 votes were cast for and 24 votes against incorporation, the village of Leetonia has been functioning as a municipality with duly elected officers. The territory embraced by the village consists of 15 forty-acre tracts, rectangular in formation, arranged in three horizontal rows of five forties. Only one forty, which is the middle one in the bottom row, is platted. This was platted in 1913 as a place of residence for the miners then employed in near-by mines and was known as Leetonia Townsite. The mining activity in the area continued until the early 1920's, and while it did Leetonia accommodated more than 200 transient miners in addition to its regular population. The need for additional places of residence for the miners of the Morton mine, located somewhat to the east, resulted in Morton Location, where more than 200 miners resided. When the mines closed, Morton Location was abandoned and all houses were removed. Leetonia lost residents to such extent that

the referee has found that only 450 people now live there. The 1940 census found only 396 persons.

The platted forty is divided into lots, blocks, streets, and alleys. It contains 89 buildings and about 200 vacant lots. Its only places of business are two grocery stores, three taverns, a liquor store, two gasoline stations (one of which deals in automobile accessories and miscellaneous merchandise), a barbershop, and a public hall. While the adult males are ordinarily miners by occupation, only a few are now employed in mines outside the village. Two are employed as janitors at the public school east of the townsite, some work for the railroad, and most are employed on WPA. The public services for the village—water, electricity, and street lighting—are provided by the village of Hibbing and by the town of Stuntz.

The other forties in the village are described by the referee as "vacant and barren" consisting "mostly of mining lands, indefinitely abandoned, with dumps and fills, roads, tracks, and drainage ditches, and more or less wet, boggy ground." Further reference to facts material to decision will be made hereafter.

The only village incorporation requirement of 1 Mason Minn. St. 1927, § 1111, involved in this proceeding is the one prescribing what unplatted, adjoining lands may be incorporated as part of the village. The provision is that "the unplatted part of such territory must adjoin the platted portion and be so conditioned as properly to be subjected to village government." In considering whether the incorporation of the village of Leetonia should be disturbed, it is well to keep in mind what this court has said this provision means.

"The final test is whether the platted territory and the adjacent territory are so limited in area and have such a natural connection, and the people residing thereon have such a community of interest, that the whole may be properly subjected to village government." State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 332, 127 N. W. 1118.

Basically, whether the particular incorporation involved measures up to this statutory test is one of fact for the people concerned, and their judgment is not lightly to be ignored. State ex rel. Simpson v. Village of Dover, 113 Minn. 452, 130 N. W. 74, 539; State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 458, 149 N. W. 951; State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 316, 178 N. W. 815. Nevertheless, the judgment of the incorporators as respects the extent to which unplatted lands appropriately may be included in the village is by no means final. When the facts clearly demonstrate that the civic pride of the incorporators has exceeded all bounds of practicable reason, then it is the duty of this court to interfere with the incorporation and compel compliance with the statutory prerequisite. See State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 207, 184 N. W. 850; State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 549, 186 N. W. 694, 189 N. W. 592.

Upon numerous occasions in the past, we have recognized that the incorporation into a village of unplatted mineral lands presents a special problem distinguishable from the annexation of agricultural lands. State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 457, 149 N. W. 951; State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 549, 186 N. W. 694, 189 N. W. 592. The extent to which the welfare of the miners, living as they do near the mines in scattered groups, is dependent upon their receiving municipal conveniences only by unity with a platted area, is a consideration worthy of judicial recognition. Only through municipal organization, financed by tax revenues from the mines, can these miners, whether inside or outside the platted area, get necessities like sewers, lights, gas, water, and police protection. But the extent to which greater latitude in the incorporation of unplatted mineral lands should be allowed to Range villages should be proportional to the evidence of need, actual or potential. See State ex rel. Simpson v. Village of Dover, 113 Minn. 452, 456, 130 N. W. 74, 539. Where it can be said that "there would be no [need for a] village here but for the existence and operation of

the mines," and that the "men inhabiting the so-called locations, surrounding the mines, [must] resort to the village proper for their needs" (State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 457, 149 N. W. 951, 953), then it would be judicial folly for us to interfere with the incorporation even though it includes mineral lands somewhat distant or remote from the platted areas. Whether the particular incorporation qualifies under the statute is of course to be decided wholly by reference to the specific facts involved. In proceeding to consider the referee's findings and the evidence upon which they are based, we will give special attention to what appear to be the community needs of Leetonia examined in light of what reasonably may be expected in the future.

In their inclusion of unplatted territory, the incorporators of Leetonia were much less ambitious than many of the other incorporations which have been the subject of previous review by this court. The inclusion of 15 forties, totaling 600 acres, does not at first blush seem excessive. *Cf.* State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 186 N. W. 694, 189 N. W. 592; State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 184 N. W. 850; State ex rel. Town of Stuntz v. City of Chisholm, 199 Minn. 403, 273 N. W. 235. Yet, since "no hard and fast rule can be laid down as to the extent of territory which may be included by incorporation in a village" (State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 334, 127 N. W. 1118, 1119), 600 acres may be excessive where the needs of the community do not measure up to that acreage.

Since the approach to the problem of the inclusion of unplatted mineral lands starts from the premise that the existence and operation of the mines has made a special rule necessary (State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 549, 186 N. W. 694, 189 N. W. 592), we must consider the facts in the record material to that issue.

With respect to the mining activity within the boundaries of the village, the referee has found that:

"The remaining forties are mining properties. Two of them are owned by the state, and the others by mining companies. There have been some exploratory operations in the past and some actual mining, but nothing is being done at the present time. The land is being held by the owners and lessees until such time as it will appear profitable to mine it. Under present conditions ore can be obtained more cheaply at other places. It is quite uncertain when operations will be resumed. It may not be for many years. The unmined tonnage is estimated at 29,000,000 tons. It will have to be done as a large operation. Some of it will be open pit mining and some underground."

This picture of a suspended industry should be contrasted with those disclosed by such cases as State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 127 N. W. 1118, and State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951, where the incorporation was upheld. There an expanding industry was shown to necessitate large numbers of workers in mine locations at outlying points, requiring the incorporation of liberal unplatted areas so as to provide those men and their families with the decencies of life. Here, however, there is a platted area, having only 396 inhabitants by the last census, attempting to expand itself 15 times over, and advancing as justification that it has included no more than future growth will require. Of the entire population, only seven or eight men from Leetonia are employed in mines, and these are located outside the village. Since early in 1920, when the mining operations ceased in that locality, the population has been on the decrease. We regarded this sociological fact as important in State ex rel. Town of Stuntz v. City of Chisholm, 199 Minn. 403, 415-416, 273 N. W. 235, which also indicates that what is a permissible incorporation of unplatted mineral lands should be determined in light of present, not past, industrial facts relative to the mining industry. Where a village seeks to annex mineral lands which are unlikely to develop for many years, if ever, in anticipation of a possible return of an industry there

dormant, upon the theory that the presently incorporated municipality will then be important, that village has lost sight of industrial reality. Today, mining operations are possible with much less labor. Contrasting the employment figure of 4,500 men in 1939, a good year, with that of 20,000 in the years following 1910, it becomes apparent that mining is possible nowadays without the same man power necessary in the past. Furthermore, transportation facilities have been so much improved that workers today are not required to be localized at their work to the extent once necessary. See State ex rel. Town of Stuntz v. City of Chisholm, 199 Minn. 403, 416, 273 N. W. 235. Several of the Leetonia residents now commute daily for distances from 13 to 19 miles. All of this is material to the reality of the supposed territorial needs of the citizens of Leetonia.

Another major difficulty with the attempted incorporation is its failure to meet the requirement that the unplatted areas be suburban in character. See, for example, State ex rel. [Childs] v. Minnetonka Village, 57 Minn. 526, 533, 59 N. W. 972, 25 L. R. A. 755; State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 332, 127 N. W. 1118. The evidence supports the referee's findings that the unplatted forties "are vacant and barren, except as hereinafter noted; and consist mostly of mining lands, indefinitely abandoned, with dumps and ·fills, roads, tracks, and drainage ditches, and more or less wet, boggy ground." Except for the two forties located immediately to the east of the townsite and owned by the state of Minnesota, which "are fairly level and dry, and would be reasonably well suited for building purposes, if there were any occasion to so use them," the referee finds that the "surface of these mining forties is more or less wet and marshy. It is not desirable for building purposes, although most of it could be so used, if desired. It is not at all likely that there will be any occasion to use this land for residence or factory purposes." Even though it be recognized that what may be suburban for a mining community probably is not suburban elsewhere, yet with unchallenged findings of fact that there is small chance that any occasion

for use will ever arise, these unplatted areas lose any suburban characteristics which they might have had and revert to their status as abandoned mineral lands.

The fact that the unplatted forties contain no inhabitants, "except in one house near the north line of the village," squarely raises the question of the extent to which the annexed areas must contain people. See State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 206-207, 184 N. W. 850. Justification for the broad inclusion of unplatted lands is frequently premised upon the fact that mining lands "derive a benefit in many ways from being included within the limits of a municipality, such as the benefit of police protection, water, lights, and sewage." State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 334, 127 N. W. 1118. It is no less than obvious that these benefits cannot be enjoyed by indefinitely abandoned mineral lands having no occupants, actual or potential. On these facts it is difficult for us to see how the unplatted areas which have been incorporated into Leetonia have that unity of interest with the platted portion which the statute requires. "The annexed territory ought of right to have some advantages for the increased taxes it pays." State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 207, 184 N. W. 850, 851. To permit the inclusion of these 14 forties would sanction unilateral benefits to the residents of the townsite.

Leetonia Townsite is described by the referee as having "no sewers, sidewalks, or pavements, except a bit of sidewalk in front of one house and another at a filling station. It has no post office, no bank, no railway station, no church, no library, no garage, no jail, no movies." There "is nothing in the townsite or in the village area to make it an attractive place to live." Considering this in connection with a further finding that the assessed valuation of the 14 forties is $883,622 and of the townsite only $15,728, it seems highly possible that a potential tax source was of much greater concern to the incorporators than potential territorial needs. "Land cannot be brought into a village arbitrarily just to increase its revenues or to add taxable property." State

ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 207, 184 N. W. 850, 851; State ex rel. Hilton v. City of Nashwauk, 151 Minn. 534, 547, 549, 186 N. W. 694, 189 N. W. 592. Indeed, the testimony of the mayor of Leetonia is persuasive of that motive. This purpose would have been less clear had the village attempted to include the populations in several of the near-by locations in which there are only residences and no places of business. To us it seems practically inescapable that the people in the townsite are attempting to install municipal conveniences for themselves by taxing practically all the costs upon the unoccupied, undeveloped, unlikely-to-be-developed, unplatted mineral lands which with their wet, marshy surface and overgrowth are largely unfit and certainly unnecessary for municipal expansion. This they may not do. Their determination that the "unplatted part" added to the townsite is "so conditioned as properly to be subjected to village government" (§ 1111) cannot be sustained.

Let writ of ouster issue.

PETERSON, JUSTICE (dissenting).

The determination of the people that the lands have such natural connection and the people residing thereon have such a community of interest that the whole might properly be subject to village government is presumed to be correct and is not to be lightly set aside. The facts are stated in the majority opinion most strongly against the incorporation. It is our duty to view the facts in that light which will sustain rather than upset the determination of the people. Speaking of the inclusion of the mineral lands as "unlikely to develop for many years, if ever" is mere prophecy for which there is no basis in the record. The people in the affected area have as much right to indulge in forecasting the future of the mining industry as our referee or we have. Their prophecy is as likely to be fulfilled as one by those who are not familiar with local conditions. Characteristic of prophets is their proneness to err. If there is to be any error it ought not to be ours. The fact is that the whole Iron Range country was supposed to be in-

capable of development, but that supposition has been refuted by the development of an industry which produces two-thirds of the nation's iron ore. In view of the changes in the industry brought about by world-wide conditions creating unprecedented demands for iron ore and the claims of the mining industry of the near exhaustion of ore now being removed in other areas, it is not unreasonable to believe that 29,000,000 tons of iron ore in such a small and compact area as that involved here might soon be mined.

On the whole, the evidence sustains the view that the entire area is industrialized by present mining industry.

The mining operations carried on in the mines on the land included in the village and other industrial activity in connection with the mines have created conditions which make an incorporated village necessary and desirable. The men living there, except those engaged in some business, are all miners. The fact that some of them have been unemployed because of conditions in the mining industry does not change the fact that the mines attracted the men to that locality and keep them there. The extensive railroad switching and freight transportation operations in connection with the mining industry have resulted in the construction of numerous spur and switching tracks to connect with main-line tracks through the village, all of which have grade crossings. There are no sewers in the village. These are needed. Relator's own witness testified that the village should control drainage for some distance from the platted areas.

Many main highways as well as mere lateral roads converge in and about the village, thus bringing a considerable traffic to the locality.

The fact that some of the land was mining property, so far from preventing the inclusion of it in the village, was a reason for doing so under the circumstances. In State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 334, 127 N. W. 1118, 1119, we said:

"The fact that the lands included in this village are suitable for mining purposes might be a reason why it would be proper so to

include them; for lands of that class may, and usually do, derive a benefit in many ways from being included within the limits of a municipality, such as the benefit of police protection, water, lights, and sewage."

While our decisions have been reviewed in the majority opinion and the instant case has been distinguished from those sustaining similar incorporations, the distinctions rest upon accidental reasons which are not controlling. The incorporation in the instant case should be sustained upon the authority of State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 127 N. W. 1118, *supra;* State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951; State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 178 N. W. 815.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.

