STATE ex rel. E. T. YOUNG v. VILLAGE OF GILBERT and Others.[1]

March 19, 1909.

Nos. 15,865—(22).

**Powers of County Commissioners.**

Under the provisions of section 700, et seq., R. L. 1905, the county commissioners are not vested with discretionary power to determine whether the unplatted portion of a village, proposed for incorporation, adjoins the platted part and is so conditioned as properly to be subject to village government.

**Territory not Subject to Village Government.**

The unplatted territory embraced within the limits of respondent village does not adjoin the platted portion and is not so conditioned as properly to be subject to village government.

Writ of quo warranto from this court to have the pretended incorporation of the village of Gilbert declared void and to have the pretended officers of the village show quo warranto they held their respective offices. The answer virtually admitted all the facts set forth in the information and alleged and relied on them as a justification for the incorporation. The answer alleged, inter alia, the territory included was three miles long by one mile wide for two miles of the length and one and one half miles wide for one mile of the length, that this territory comprised 56 forty acre tracts of land. The state demurred to the answer on the ground it did not state facts sufficient to constitute a defense to the information. Writ of ouster granted.

*Edward T. Young,* Attorney General, *George T. Simpson,* Attorney General, and *Washburn, Bailey & Mitchell,* for the State.

*Baldwin, Baldwin & Dancer* and *J. C. McGilvery,* for respondents.

[1] Reported in 120 N. W. 528.

LEWIS, J.

This was a proceeding in quo warranto to test the validity of the incorporation of the village of Gilbert. The situation will be understood by reference to the accompanying plat. The territory includes 2,240 acres, located in the mining district of the Mesaba Range, St. Louis county. The entire tract, except as hereinafter stated, consists of wild, unimproved, cut-over lands, not specially suitable for agricultural purposes, and not inhabited. The platted portion consists of eighty acres, upon which ninety eight people resided. The Petit mine is located upon the southwest 40 of section 24, and the northwest 40 of section 25, in which locality one hundred eighty three people resided. The Hobart mine is located upon the east one half of the northwest quarter of section 25, upon which eighty four people resided. The La Belle mine consisted of the northwest quarter of the northeast quarter of section 24, upon which sixty eight people resided. There was another mine located upon the west half of the southeast quarter

of section 24, but the pleadings do not disclose the number of inhabitants residing in that vicinity. On the forty acre tract in section 26, immediately south of and adjoining the platted portion, two hundred eighty eight people resided, and on the easterly portion of section 26 there resided two hundred people. Three lines of railway extend through portions of the territory, as noted on the map, which connect the several mines with the main lines from the range to Duluth.

The alleged attempt to incorporate the village was begun in the spring of 1908, and according to the answer a schoolhouse is being erected on the platted portion at a cost of $60,000, streets have been improved at an expense of about $4,500, and a lock-up built at a cost of $2,000. Streets have been laid out and graded, and sidewalks constructed. The village is a growing community, with stores and a telephone system; and an indebtedness of $6,000 has been incurred. It is stated in the answer that the territory in the northerly part of section 26 was not included as a part of the proposed village, for the reason that those residents were opposed to incorporation, and the voters residing thereon would have voted against the proposition. The answer also states that the reason why so large an extent of unimproved, wild, and cut-over lands is included is to better protect the village from forest fires and undesirable settlements in the vicinity; that the police protection, and the control of fires, peddlers, and school facilities for the whole community can be accomplished best with the nucleus on the platted portion as a center. Of those residing on the platted portion, who voted at the election to incorporate, sixty seven voted for incorporation and twenty seven voted against it.

The territory involved in this proceeding is not of so great extent as that involved in State v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755, and State v. Village of Fridley Park, 61 Minn. 146, 63 N. W. 613. In amount of territory the case more nearly conforms to the territory involved in State v. Village of Holloway, 90 Minn. 271, 96 N. W. 40, but resembles the two former cases in that the proposed territory embraces several settlements having no natural connection and located at considerable distances from the platted portion.

The settlements around the several mines consist of miners and their families, and, although no stores are maintained at the mines, it is ap-

parent that the general purposes for which villages are incorporated have no common relation between these clusters of people. Large tracts of undeveloped, wild, and uninhabited land intervene, and the territory, as a whole, does not constitute a. village, within the definition so well expressed in State v. Minnetonka Village, supra: "A 'village' means an assemblage of houses, less than a town or city, but nevertheless urban or semiurban in its character; and the object of the law was to give these aggregations of people in a comparatively small territory greater powers of self-government and of enacting police regulations than are given to rural communities under the township laws. The law evidently contemplates, as a fundamental condition to a village organization, a compact center or nucleus of population on platted lands; and, in view of the expressed purposes of the act, it is also clear that by the term 'lands adjacent thereto' is meant only those lands lying so near and in such close proximity to the platted portion as to be suburban in. their character, and to have some unity of interest with the platted portion in the maintenance of a village government. It was never designed that remote territory, having no natural connection with the village and no adaptability to village purposes, should be included." Here are several distinct mining settlements separated from each other, and from a half mile to a mile and a half from the village proper. It has not been made to appear how these separate communities can be brought together into one homogeneous people, and equitably and economically governed with respect to light, and police and fire protection, to say nothing of the benefits to be received by the distant settlements from the graded streets and sidewalks within the platted portion. As to these scattered communities, every element of "suburban character" and "unity of interest" is lacking.

But respondents insist that the statute, as amended, confers upon the county commissioners authority to determine whether the proposed unplatted territory adjoins the platted part and is "so conditioned as properly to be subject to village government," and that their decision is final.

Prior to the amendment the statute read: "Any district, sections, or parts of sections, not in any incorporation village, and in the state of Minnesota, which has been platted into lots and blocks, also the lands

adjacent thereto, when said plat has been duly and legally certified according to the laws of this state, and filed in the office of the register of deeds for the county in which said lands or the larger portion thereof lie, said territory containing a resident population of not less than one hundred and seventy-five, may become incorporated as a village under this act in the following manner." Section 1200, G. S. 1894.

The amendment (section 700, R. L. 1905) reads: "Territory not already incorporated, which has been wholly or partly platted into lots, with a view to village occupancy, and which has a resident population of not more than three thousand nor less than two hundred, may be incorporated as a village in the manner hereinafter prescribed. But the unplatted part of such territory must adjoin the platted portion, and be so conditioned as properly to be subjected to village government." The amendment adopts the construction by this court of the previous statute, and emphasizes the principle that ouside unplatted territory cannot be included in a village unless it is so situated that it is naturally connected with and so situated as to be subject to village government.

As to the procedure, the following changes were made: Under the law in effect prior to the amendment, the statute (section 1201, G. S. 1894) provided that thirty or more of the electors then residents upon the lands to be incorporated might petition the county commissioners to appoint a time and place when and where the electors actually residing upon the lands should vote upon the question. The petition was to set forth the boundaries, the quantity of land therein embraced, and the number of persons actually residing in the territory, to be determined by a census to be taken under the direction of the petitioners; and section 1202 provided that the county commissioners, upon delivery to them of the petition, should post or cause to be posted in five of the most public places within the territory three copies of the petition, stating the time and place within the limits of the proposed village when and where the electors might vote for or against the incorporation, and the commissioners were required to appoint three inspectors to preside at the election. The law as amended (section 701) provides that twenty five voters residing within the territory must sign the petition. Section 702 reads as follows: "If the county board

approve said petition, it shall cause a copy thereof, with a notice attached fixing a time and place for holding such election, to be posted in three public places within the boundaries described. The time shall be not less than twenty nor more than thirty days after such posting, and the place within the limits of the proposed village. If there be a qualified newspaper published within said limits, there shall also be two weeks 'published notice of such election.' " Under the old statute the commissioners were not vested with any discretionary power. It was simply made their duty, when a petition in the proper form was presented to them, to cause the notice of election to be given and appoint inspectors for the election. They did not even have the power to go back of the petition and determine the genuineness of the signatures, as is prescribed in proceedings for the removal of county seats.

But it is claimed that the legislature intended to make a radical departure, and that section 702 vests in the county commissioners discretionary power to pass upon the merits of the proposition and determine whether or not the territory set out in the petition adjoined the platted part, and was so conditioned as properly to be subject to village government. It is argued that, the commissioners in this case having considered the merits, having exercised their discretion, and determined that the outlying territory did adjoin the platted part and was so connected as to be subject to village government, their decision is final and not subject to review.

This occasion does not call for any extended consideration of the powers which may be delegated to bodies such as boards of county commissioners. It is a vexed question, concerning which there is a wide divergence of judicial opinion. It is the settled law of this state, so far as the incorporation of municipalities is concerned, that the legislature may designate such bodies as the instrumentality to submit to the voters the question of incorporation. But in our examination of this class of cases we have failed to discover any instance where such a body has been vested with judicial or quasi judicial powers sufficient to consider and finally determine the merits of the question. That the legislature intended to introduce so radical a change is not warranted by the language of the amendment. The significant words relied upon by respondents are: "If the county board approve said petition." What is meant by the word "approve"? Does it refer to the determi-

107 M.—24

nation of the reasonableness of the proposition to include the outlying territory, or does it merely mean that the commissioners shall determine from the face of the petition whether it contains the requisite number of residents and signers, and is in proper form? It is our opinion that the amendment imposes no new duties on the board of commissioners. It is simply another way of stating the same duty imposed by the former statute. Upon the admitted facts, the village was not incorporated in accordance with the law.

While the acting officers of the supposed village have gone on and incurred certain expenses for improvements, the relator has not been guilty of such delay in bringing this action as to call for the application of the principle of waiver or estoppel. There has been no express recognition of the village by the state, and the case is clearly distinguishable from St. Paul Gaslight Co. v. Village of Sandstone, 73 Minn. 225, 75 N. W. 1050, and State v. Village of Harris, 102 Minn. 340, 113 N. W. 887, 13 L. R. A. (N. S.) 533.

Let the writ of ouster be issued.