## STATE EX REL. CLIFFORD L. HILTON v. SO-CALLED "VILLAGE OF MINNEWASHTA" AND OTHERS.[1]

December 24, 1925.

No. 25,032.

**Writ of ouster against respondent village.**

1. Writ of ouster ordered against a recently incorporated village (and its officers), because its area consists almost exclusively of agricultural land, containing no nucleus or population and not conditioned, as required by the statute, so as to be properly subject to village government.

**Writ of quo warranto required by violation of law.**

2. Motion to discharge the writ of quo warranto, upon the ground that no public necessity for it appears, denied. The mere fact that the law has been violated and an illegal village organized constitutes a prime public necessity, and all that is needed, not only to justify but to require the writ.

1. See Municipal Corporations, 28 Cyc. p. 150.
2. See Courts, 15 C. J. p. 1077, § 507; Quo Warranto, 32 Cyc. p. 1424.

Upon the relation of the attorney general the supreme court granted its writ of quo warranto directed to the village of Minnewashta and its officers to show cause why the incorporation should not be declared illegal and its officers ousted. Writ of ouster.

*Clifford L. Hilton*, Attorney General, *Albert F. Pratt*, Assistant Attorney General, and *A. B. Jackson*, for relator.

*George T. Simpson*, for defendants.

STONE, J.

Original proceeding by writ of quo warranto, on relation of the attorney general, challenging the legality of the incorporation of the village of Minnewashta. The evidence taken before the referee, all of it on behalf of the relator and none for respondent, is before us.

[1]Reported in 206 N. W. 455.

The case has been submitted on the merits, subject to motions made by respondents to discharge the writ upon several grounds, only one of which calls for discussion. It will be referred to later.

The village was recently incorporated under sections 1111 and 1115, G. S. 1923. There is no formal objection to the petition for the election and the certification of the result to the county auditor and secretary of state. At the election 206 ballots were cast for and 162 against incorporation. The village has a permanent population, exclusive of a large number of summer residents, of about 800. The individual defendants are the first officers of the newly-formed village and if the incorporation was illegal and without effect, as we hold it was, there are no offices for them to fill.

The territory of the village is situated westerly and southwesterly of the village of Excelsior in Hennepin county. It has an area of substantially 3,000 acres, a little more than half being in Hennepin county and the remainder in Carver county. The tract is irregular in shape. The portion in Hennepin county consists, roughly speaking, of an oblong containing substantially three sections. The Carver county portion projects southerly from the westerly half of the Hennepin county tract and contains probably a section and a half, again speaking with only rough approximation. The longest east and west diameter of the whole tract is about $3\frac{1}{2}$ miles and the longest north and south diameter about $2\frac{1}{2}$ miles. In the north or Hennepin county end of the village is Ball's Addition to the village of Excelsior. It is platted into lots and blocks. It is there probably that we find what is, more nearly than any other location in the village, a hamlet or assemblage of buildings and a real nucleus of population, interest and activity. But as a center of either interest or activity it is not local or peculiar to the new village. Ball's Addition, we are given to understand, is in reality a suburb of the village of Excelsior.

From the standpoint of density of population, the next most important location in the proposed village may be Red Cedar Point which is almost at the southern extremity of the area, in Carver county. This point projects into Lake Minnewashta, is platted and

occupied exclusively by summer residences. It is well over two miles in an air line from Ball's Addition and nearly three miles by the shortest highway.

The village is bounded along its northern and westerly limits by Lake Minnetonka, on the shores of which are four platted areas, each separated from the other, and all used for purposes of summer residence. Both these areas and Red Cedar Point on Lake Minnewashta are thickly enough populated during the summer months, but not otherwise occupied at all, or only to a very slight degree, for the purposes of human habitation.

The territory is well supplied by highways, the principal one being Minnesota Trunk Highway No. 12—the Yellowstone Trail. It carries a very heavy traffic which is of course increasing rapidly. The main line of the Minneapolis & St. Louis Railroad runs through the village from northeast to southwest, probably 2/3 of the total area lying to the southeast. On this railroad, about 3/4 of a mile from where it crosses the northern boundary of the village, is the post-office of Eureka. There is a store here and, outside of Ball's Addition to Excelsior and the lake-shore tracts already referred to, Eureka may come nearer to presenting a real assemblage of buildings and nucleus of population than any other location in the relatively extensive area of the village. Eureka is not platted into lots and blocks. Something like half a mile south of west of Eureka is a consolidated school employing 4 teachers. Less than half a mile south of that is the Minnewashta Club. Adjacent thereto, as the maps submitted to us indicate, there is an entire quarter section of land almost unoccupied by human habitation other than the club building. A little over half a mile southeasterly from Eureka are the golf links of the Minnetonka Country Club, over a hundred acres in extent. A mile southeasterly from Eureka, on the railroad, is the station of Minnewashta (unplatted), where there is a church, but otherwise no suggestion of village or even hamlet.

Separated by relatively substantial distances from all of the locations thus referred to, there is another store and a small garage or two, a cemetery and, we are told, an "ice plant." Otherwise

than as we have indicated, there is no nucleus of population, nor even a defined center of permanent habitation suggested by evidence or argument. On the contrary, the whole area being given over to agriculture, the population is pretty evenly separated. This, of course, takes no account of transient summer residents.

Aside from the uses already indicated, all the land is given over to agricultural purposes, a large portion occupied and used by real farms, if not by real or "dirt farmers." The farms range in size from 7 to 200 acres. There are numerous truck gardens. The territory is all in the justly famed Minnetonka fruit region and the raising of berries is general. There are some vineyards. So far as the use of ground is concerned, the area is, with the exceptions already noted, almost exclusively agricultural, horticulture being the dominant specialty. There are many orchards. There is much dairying with its attendant use of ground for pasture and meadow. It happens to be the section of the state where alfalfa was first made a sure and profitable crop and much of it is grown there now. Poultry is raised to a considerable extent. In short, diversified agriculture is the outstanding activity of the community. The territory is not rendered otherwise than agricultural by reason of the fact that many of the homes are those of Minneapolis business and professional men. The fact that a goodly number of the occupants of the homes in the proposed village are really Minneapolitans does not change the character of their country homes and agricultural activities from rural to urban.

The respondents have deliberately and frankly refrained from any final or binding choice of any one location having the characteristics of "a compact center or nucleus of population on platted lands" which it was held in State v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755, is "a fundamental condition to a village organization." But if we pass that notable defect in respondent's case, we still have an insurmountable obstacle to its success. For the purposes of village organization and government, there is little if any natural connection or community of interest between any considerable portion of the community and any of its supposed nuclei of population.

Finally, the whole area is so exclusively agricultural and rural, so obviously and wholly otherwise than urban in character, that it has not adaptability for village purposes and is not so conditioned as to be subjected to village government. (Ball's Addition probably is the only spot that is even semiurban). That is a question with respect to which, the facts appearing, no presumptions are to be indulged in favor of the propriety of the incorporation. State ex rel. v. City of Nashwauk, 151 Minn. 534 (549), 186 N. W. 694, 189 N. W. 592. It is too clear for argument both that very much of the unplatted portion of the territory in question does not "adjoin" any one platted portion, and is not "so conditioned as properly to be subjected to village government." In these two respects at least, G. S. 1923, § 1111, has been violated. The conditions required by the statute do not exist. The election and the entire proceedings for the incorporation of the village are in consequence void. In addition to the cases already cited see State ex rel. v. Fridley Park, 61 Minn. 146, 63 N. W. 613; State ex rel. v. Holloway, 90 Minn. 271, 96 N. W. 40; State ex rel. v. Gilbert, 107 Minn. 364, 120 N. W. 528; State ex rel. v. Buhl, 150 Minn. 203, 184 N. W. 850; State ex rel. v. Alice, 112 Minn. 330, 127 N. W. 1118.

The one ground for respondent's motion to dismiss which we notice is that, notwithstanding the writ was applied for by the attorney general, it is claimed that there was no "public necessity" for its issue. In that connection the suggestion is made that the proceedings are attacked only by representatives of the minority of the involved citizens who opposed the incorporation from the start. There is nothing to the point. It is enough that a law of the state has been violated. It is enough that an illegal attempt has been made to create another municipal subdivision of the state with its attendant increase of public officers, and their salaries or other compensation to be paid by taxation. It is enough that an attempt has been made to bring about a further delegation of the sovereign powers of police and legislation to a new and additional set of local officers. When any such attempt is made and is illegal, the mere illegality of it furnishes a prime public necessity, one

which not only justifies his action but also requires the attorney general to do what he has so properly done in this case.

All else aside, it is difficult to suppose a case wherein this court, in the exercise of its original jurisdiction, would refuse to issue a writ of quo warranto upon the relation of the attorney general and an information making a prima facie case. True, where there are issues of fact, the district court is the appropriate tribunal for their determination and in such cases the application should be made there. But the writ is "of right for the commonwealth against one who usurps or claims franchises or liberties." State ex rel. v. Kent, 96 Minn. 255 (264), 104 N. W. 948, 952 (1 L. R. A. [N. S.] 826, 6 Ann. Cas. 905). And the attorney general as the constitutional law officer of the state has a wide discretion not only in determining the occasion for the writ but also in selecting the tribunal from which it shall issue.

Let a writ of ouster issue as prayed for in the information.