## STATE EX REL. NORTHERN PUMP COMPANY AND ANOTHER v. SO-CALLED VILLAGE OF FRIDLEY AND OTHERS.[1]

March 30, 1951.

No. 35,061.

*Dorsey, Colman, Barker, Scott & Barber* and *Leavitt R. Barker,* for relators.

*Hall, Smith & Hedlund, Wyman Smith, Snyder, Gale, Hoke, Richards & Janes,* and *Edmund T. Montgomery,* for respondents.

LORING, CHIEF JUSTICE.

This is a proceeding in the nature of quo warranto originating in this court to challenge the legality of the incorporation of the vil-

---

[1]Reported in 47 N. W. (2d) 204.

lage of Fridley. January 29, 1949, 25 legal voters, residing within the territory sought to be incorporated, initiated incorporation proceedings by submitting a petition for the same to the board of county commissioners of Anoka county. The board, in response to the petition, designated a time and place for holding an election at which the legal voters within the proposed village area might express their preference in ballots cast for or against the incorporation. The election was held June 7, 1949, and the result was 431 "for" and 343 "against" incorporation. The county auditor filed an appropriate certificate with the secretary of state pursuant to M. S. A. 412.06. June 28, 1949, village officers were elected. They subsequently qualified, and the village council enacted ordinances.

By inadvertence and mistake, 48.5 acres already incorporated within the city of Columbia Heights was included in the territory sought to be incorporated as the village of Fridley. This error was discovered prior to the election, and no residents of that area voted on the matter of incorporation. No person resident in the Columbia Heights area had signed the petition for incorporation.

The relators in this action, Northern Pump Company and its subsidiary, Northern Ordnance, Inc., are business corporations which have large plants located within the village area. July 15, 1949, relators, with the consent of the attorney general, petitioned this court for a writ of quo warranto challenging the legality of the incorporation, and such a writ was issued to the village and its officers requiring it and them to show by what warrant the village exists and such persons hold their offices. Thereafter, a referee was appointed under M. S. A. 546.36 to take testimony and to make findings of fact and conclusions of law with reference to the issues presented.

Testimony was taken and evidence was introduced before the referee during the months of November 1949 and January 1950. Arguments were subsequently heard by the referee, and additional facts were stipulated. November 3, 1950, the referee made and filed

his findings of fact and conclusions of law that a writ of ouster should issue.

The conclusion that a writ of ouster should issue was based upon the theory that the mistaken inclusion of the .48.5 acres of land lying within the city of Columbia Heights vitiated the whole incorporation proceeding. The correctness of that conclusion is the first question presented for decision.

In State ex rel. Luley v. Simons, 32 Minn. 540, 21 N. W. 750, this court, speaking through Mr. Justice Mitchell, held that L. 1883, c. 73, was unconstitutional as a delegation of legislative powers to the district court. The powers held to have been improperly delegated were the powers to determine whether the lands sought to be incorporated ought justly to be incorporated in the proposed village; whether the interests of the inhabitants would be promoted thereby; and whether the proposed area should be enlarged or diminished "as justice may require."

The court intimated in obiter dicta that (32 Minn. 543, 21 N. W. 752) "certain legislative powers regarding the organization and incorporation of villages" might be delegated to boards of county commissioners and that "The delegation of certain powers of local legislation to municipal bodies, for reasons already suggested, is permissible." The state legislature accepted the suggestion and enacted L. 1885, c. 145, which provided for the incorporation of platted areas and adjacent lands upon petition to the board of county commissioners by 30 or more electors of the proposed village. The board was required to submit the question of incorporation to the electors of the proposed village. If a majority voted for incorporation, an appropriate certificate was to be filed with the register of deeds, and the proposed area became a village. Under this law, the delegated legislative function was apparently placed in the electors of the proposed area. L. 1885, c. 145, as interpreted in State ex rel. v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755, was held to be constitutional in St. Paul Gaslight Co. v. Village of Sandstone, 73 Minn. 225, 75 N. W. 1050, against a

contention that it was an improper delegation of legislative power to the electors of the proposed village.

In the Minnetonka case (57 Minn. 533, 59 N. W. 974), "lands adjacent thereto" was held to mean "those lands lying so near and in such close proximity to the platted portion as to be suburban in their character, and to have some unity of interest with the platted portion in the maintenance of a village government." The word "adjacent" was subsequently changed to "adjoin," and a provision was inserted which required that petitions for incorporation be approved by the county board. R. L. 1905, §§ 700 and 702. In State ex rel. Young v. Village of Gilbert, 107 Minn. 364, 120 N. W. 528, it was held that the latter provision did not invest the board with any power to determine the legislative questions involved in the petition, but only to determine whether the petition had the requisite resident signers and was in proper form. The provision added by § 702 was subsequently incorporated into M. S. A. 412.011, subd. 3, in substantially similar language. These holdings, by a process of elimination, would seem to leave the legislative functions susceptible to delegation by the legislature to the voters of the proposed village. However, this court has held in State ex rel. Burnquist v. Village of Leetonia, 210 Minn. 404, 407, 298 N. W. 717, 719, that the judgment of the incorporators is not final and that when the determination made by the incorporators exceeds the "bounds of practicable reason, then it is the duty of this court to interfere * * * and compel compliance with the statutory prerequisite." The final test of that prerequisite is (210 Minn. 406, 298 N. W. 719)—

"whether the platted territory and the adjacent territory are so limited in area and have such a natural connection, and the people residing thereon have such a community of interest, that the whole may be properly subjected to village government."[2]

The above cases and those cited by relators[3] carefully distinguish between judicial functions of the courts and the legislative function

---

[2]See, State ex rel. Simpson v. Village of Alice, 112 Minn. 330, 332, 127 N. W. 1118.

[3]See footnote 4, *infra*.

which the legislature may and has delegated to the village incorporators. This court has refrained from interfering with the exercise of the delegated legislative functions as long as the incorporators have exercised those functions within the scope of the power delegated, but has interfered when it was sought to be exercised unreasonably.[4] In the cases cited, it likewise has refrained from itself performing legislative functions by rejecting, from the area sought to be incorporated, the areas unsuitable for village government; and in such cases it has further refrained from redefining boundaries. In those cases where the incorporators have exceeded their delegated legislative authority, by including territory not reasonably suitable for incorporation, this court has not hesitated to declare the entire incorporation void. However, in the case at bar, a different situation is presented. The Columbia Heights area was not included in the proposed village territory by an unreasonable attempt to incorporate unsuitable but otherwise eligible land. The Columbia Heights annex was included in the petition by mistake and inadvertence induced by error in official county maps. Exclusion of this territory calls for the exercise of a purely judicial function. This court, as well as the incorporators and electors, must recognize the statute[5] which makes land lying within an existing

[4] State ex rel. v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755; State ex rel. Childs v. Village of Fridley Park, 61 Minn. 146, 63 N. W. 613; State ex rel. Douglas v. Village of Holloway, 90 Minn. 271, 96 N. W. 40; State ex rel. Young v. Village of Gilbert, 107 Minn. 364, 120 N. W. 528; State ex rel. Hilton v. So-called "Village of Minnewashta," 165 Minn. 369, 206 N. W. 455; State ex rel. Burnquist v. Village of Leetonia, 210 Minn. 404, 298 N. W. 717; State ex rel. Burnquist v. Village of North Pole, 213 Minn. 297, 6 N. W. (2d) 458.

[5] M. S. A. 1945, § 412.02. Although this statute only made territory within an existing *village* immune from being incorporated into another village, it is clear that cities which have succeeded to the rights of earlier villages under the provisions of M. S. A. 410.15 are equally immune from encroachment. The parties to this proceeding agree that such is the case. Section 412.02 was repealed by L. 1949, c. 119, § 110, effective July 1, 1949, and by § 1 thereof a new section was enacted (§ 412.011, subd. 1), which makes land ineligible for incorporation if it is already included in an incorporated *municipality*.

municipality ineligible to be incorporated in a proposed village. By enforcing this statute, this court does not exercise the legislative function of redefining the boundaries of the proposed village. The legislature itself has spoken and forbidden the inclusion of the previously incorporated territory and has not delegated any authority with reference thereto. The boundary is circumscribed by operation of law legislatively enacted, and we merely give effect to the superior prohibition. We do not determine that the incorporators unreasonably attempted to exercise their delegated function, but that their inclusion of this area was void *ab initio,* as contrary to the statute.

We therefore hold that the inclusion of 48.5 acres of the Columbia Heights territory does not vitiate the whole proceeding, but that a writ of ouster must issue as to the area illegally included.

■ This brings us to a consideration of whether the remaining portion of the territory in the village of Fridley is suitable for incorporation. The referee found that the territory sought to be incorporated in the village of Fridley was, as a whole, "suburban in character with the houses and places of business somewhat scattered," and "That the area included in the corporation * * * is so conditioned as to be properly subjected to village government."

The proposed area is five miles long and from one to three miles wide; contains more than 30 different tracts platted into lots and blocks, many of them being entirely disconnected from other platted parts, the intervening tracts being open farm land; 287 families have vegetable gardens, and some 17 families are engaged in small-scale farming.

At the time the petition for incorporation was filed, the village had a population of approximately 2,300 residents. The village lies entirely within the suburban area of the city of Minneapolis and within the metropolitan district, as outlined by the United States Department of Commerce. It is served by "city delivery" of United States mail, and "rural delivery" has been wholly discontinued. The area has transportation facilities, paved highways, bus lines, and telephone communication.

The resident families within the territory are largely those of employed people, about 75 percent of whom are employed in the metropolitan centers of Minneapolis, St. Paul, Fridley, and Columbia Heights. The average home consists of four or five rooms. Seventy percent of the family residents occupy less than one acre of land. This is a significant indication of the suburban character of the area.

School district No. 23 is entirely within the proposed village, and its census of school children shows 300 to 400 children in the first six grades. Children in the seventh and eighth grades are sent to a city school. The total number of school children in the village runs close to a thousand. Parts of school districts Nos. 6, 32, and 65 are within the village.

Although the village territory contains in excess of 5,000 acres, everything in evidence indicates that a rapid and extensive development of the territory can be reasonably expected. The population of the area has shown a marked increase during the last three to five years, 70 percent of the family residents having moved into the area within that period. Only 14 percent have lived in the area for ten years or more. It is shown by stipulation that building permits issued within the proposed village from February 1, 1950, to September 27, 1950, aggregate $640,180 in estimated value—55 of which buildings were dwellings with an estimated value of $463,300. There was one schoolhouse included at an estimated cost of $100,000. The school population within the proposed village showed a very marked increase within the years immediately prior to the filing of the petition. The fact that some of the land incorporated in the village is now undeveloped and/or unplatted does not necessarily mean that such land is not so conditioned as to be properly subject to village government. In State ex rel. Simpson v. Village of Dover, 113 Minn. 452, 455, 130 N. W. 74, 76, 539, the court, in passing upon the propriety of incorporating the proposed area as a village, said:

"* * * Another statutory limitation is that the unplatted lands must be so conditioned as to be properly subject to village govern-

ment. The statute recognizes the necessity of including such territory, but this does not mean that lands used for agricultural purposes cannot be included. It does not mean that there must be a present necessity for such lands for building or other village purposes. It is not necessary that all such lands shall be platted, graded, or used for village purposes at any particular time in the future. Adjoining lands may be brought within the limits of the corporation and be subjected to village government, if it may fairly be said that there exists, or may exist within a reasonable time in the future, a unity of interest in the enforcement of the law, such as police patrol and the public health."

Under the tests set forth in the Village of Dover case, we are unable to say that the electorate in the village of Fridley was unreasonable in its determination that the undeveloped areas, which adjoin the platted areas in the village, are suitable for incorporation.

There are in excess of 60 small businesses scattered throughout the village. These consist of grocery stores, filling stations, garages, a hardware store, a feed store, taverns, a florist shop, a woodworking factory, building and construction companies, a rest home and hospital, a sporting-goods shop, a trap-shooting club, a chiropractor's office, a furniture store, and a weekly newspaper. There are three large, heavy industries in the area. They are the Northern Pump Company and its subsidiary, Northern Ordnance; the Minnesota Linseed Oil Company; and the National Pole & Treating Company. These industries employ a large number of people, especially in times of national emergency, most of whom live in the metropolitan area.

There is a nucleus of residences in the platted Hyde Park district, and other residences are scattered promiscuously over the area.

In addition to this specific showing of population expansion and increasing development in the village area, the referee called attention to another factor which has an important bearing upon the expectation that this village will expand further. In his memorandum the referee stated (Relators' Brief, p. 125):

"The past one-hundred years have witnessed great and fundamental changes in the structure of our society and in the lives and occupations of our citizens. It has witnessed the transformation of a predominately agricultural society into one predominately industrial. Around industrial centers have sprung up great metropolitan areas like St. Paul-Minneapolis. The majority of our people no longer till their own soil for a living, but work for someone else in factories and industries or in the cities surrounding them. Improved roads and means of transportation have made it possible for them to work in the cities and to reside in areas surrounding them. The flow of population which was earlier from farms to cities now seems to be reversing itself to the extent that areas outside, but near to the cities, are increasing in population faster than the cities themselves. This is true in the township of Fridley which lies just outside of the cities of Columbia Heights and Minneapolis, and in close proximity to the City of St. Paul. Up until the past few years the township was almost entirely rural. The population has been increased greatly in the past three to five years by the influx of industrial workers, most of whom are employed in the nearby cities."

Aside from the future development that the village incorporators can reasonably expect, the village area at the present time shows considerable development and already presents a need for greater governmental service.

The referee found specifically that school district No. 23 would benefit from building and zoning controls enacted by the village; that the problems of sewer, water, light, fire, and police protection are common to the residents of the whole area. Relators having provided for their needs, in part by their own facilities and in part by contract with adjoining cities, the referee found that they "will derive no immediate benefit from the incorporation except that of being located in an improving and better governed community."

The referee found that the village of Fridley is not an isolated

community, but is suburban in character. In the memorandum attached to his findings he states (Relators' Brief, p. 124):

"The facts which lead the Referee to conclude that insofar as the physical facts are concerned the incorporation can be sustained are that a majority of the voters have voted for it; that the village government is operating and from its nature will be able to operate in a manner to the betterment of the community in a way in which a township government would have difficulty in doing."

The referee was right in giving weight to the judgment of the incorporators, for their judgment is not lightly to be ignored; and, when exercised in conformity to law, it should not be set aside, unless the evidence clearly demonstrates that the area to be incorporated is not suburban in character and is not likely to become so in the near future or that no community of interest exists between the inhabitants of the proposed village.[6]

By the tests we have stated and upon the evidence presented, we think that the judgment of the incorporators, in determining that this village area is suitable for incorporation, was properly exercised and that the incorporation should be sustained. We might add that the findings of the referee, upon which we have relied in part and which stand in support of the incorporators' determination, have the effect of a special verdict,[7] which is entitled to the same weight as a general verdict and is thus final upon appeal where the evidence is conflicting.[8]

Let a writ of ouster issue to the village and its officers as to the 48.5 acres inadvertently included in the petition.[9] With respect to the remainder of the village territory, the writ is discharged both as to the village and its officers.

So ordered.

[6]State ex rel. Burnquist v. Village of Leetonia, 210 Minn. 404, 298 N. W. 717; State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 178 N. W. 815.

[7]State ex rel. Town of Stuntz v. City of Chisholm, 199 Minn. 403, 273 N. W. 235.

[8]Blume v. Ballis, 207 Minn. 393, 291 N. W. 906.

[9]The 48.5 acres referred to are:

"A portion of the southwest quarter of Section 34, Township 30, Range

24, being the following blocks in Columbia Heights Annex to Minneapolis, according to the plat thereof filed of record in the office of the Register of Deeds of and for Anoka County, Minnesota: Blocks 73, 74, 75, 76, 77, 78, 79, 95, 96, 97, 99 and 100."

