# STATE EX REL. TOWN OF WHITE BEAR AND OTHERS v. CITY OF WHITE BEAR LAKE.

95 N. W. (2d) 294.

March 6, 1959—Nos. 37,544, 37,545.

*Edward G. Springer,* City Attorney, and *William J. Fleming,* pro se, for appellants.

*Wille & Wille, Robert F. Wille, Thomas, Bradford, King & Collatz, Paul C. Thomas, Doherty, Rumble & Butler,* and *Francis D. Butler,* for respondents.

MATSON, JUSTICE.

Appeal from an order denying a new trial in each of two district court quo warranto proceedings wherein the court held invalid the attempted annexation to the city of White Bear Lake of certain portions of White Bear Township and ordered a writ of ouster to issue.

The two quo warranto proceedings, both involving the same issues, were consolidated for trial and for review upon this appeal.

These issues arise: (1) Whether either or both attempted annexations are invalid upon the ground that the initiating petitions were entertained by the governing body of the city of White Bear Lake within the 2 years following a prior annexation election at which the majority of votes were cast in the negative; (2) whether the annexed territory, which is located in a metropolitan area, is so conditioned as to be subject for annexation to the city of White Bear Lake; (3) whether a failure to verify one of the petitions, as required by statute, renders the annexation void; and (4) whether any part of the annexed land is "more than one and one half miles from the present limits of the city" contrary to statutory requirements.

On March 18, 1957, a petition for annexation of approximately 1,240 acres of territory to the city of White Bear Lake, hereafter called the north petition, was executed and filed pursuant to M. S. A. 413.12. *Two days later* a second petition, herein referred to as the south petition, involving about 2,186 acres was executed and filed. The south petition was not verified by the oaths of at least three of the petitioners as required by § 413.12, subd. 2. All territory embraced by each petition was located in the township of White Bear. The governing body of the city of White Bear Lake entertained both petitions at a meeting on March 26, 1957, and fixed April 13, 1957, as the date of elections. The majority of the votes in each proceeding were cast in favor of annexation.[1]

■ We turn to the first issue as to whether either or both attempted annexations are invalid on the ground that the statutory petitions were

---

[1] AN APPELLATE JUDGE'S PRAYER:

May the record in annexation proceedings ever clearly show to which particular exhibit the testimony of each witness relates.

entertained by the governing body of the city of White Bear Lake within 2 years following a prior annexation election wherein the majority of votes were cast in the negative. Applicable here is § 413.12, subd. 5, which provides:

"* * * If the certificate shows that the majority of votes cast were in the negative, no subsequent petition shall be entertained within two years next after that election."

The issue of invalidity under the foregoing section arises from the circumstance that on October 6, 1956—or only about 6 months prior to the entertainment of the petitions herein—an annexation election involving much of the same territory was held and the majority vote was cast in the negative. The trial court, which made separate findings in each of the two proceedings, found that the combined effect of the north and south annexations was substantially similar to what the effect of the 1956 election would have been had a majority voted in favor of annexation and concluded that under § 413.12, subd. 5, both annexations were invalid.

Whether the trial court erred in its findings and conclusions depends upon the construction of § 413.12, subd. 5, as applied to the evidence herein. Obviously in enacting § 413.12, subd. 5, it was not the intent of the legislature to prohibit all annexations for 2 years but only those which involved substantially the same question upon which the voters had cast a negative vote. This conclusion is fortified by the 1949 legislative enactment pursuant to which § 413.12 was amended so as to be left applicable only to cities (L. 1949, c. 119, § 111—now § 412.921) and a new section was enacted to apply only to villages (L. 1949, c. 119, § 7—now § 412.041). The new provision applicable to villages, which corresponds to § 413.12, subd. 5, is § 412.041, subd. 5, which reads:

"* * * If a majority of votes cast is in the negative, no subsequent petition for annexation *of the same area* shall be entertained for two years after the election." (Italics supplied.)

Since the 1949 enactment for villages appears to be only a clarification of the language used in § 413.12, subd. 5, it is reasonable to assume

that the two sections dealing with the same problem are in pari materia and that § 413.12, subd. 5, is therefore to be construed as if it contained the phrase "of the same area."

The obvious legislative purpose in enacting § 413.12, subd. 5, is to protect people *in the same area* from unreasonably frequent annexation attempts. In short, voters are not to be bothered by substantially the same annexation problem *as to area* any oftener than once every 2 years. We use the phrase *substantially the same annexation problem as to area* advisedly since it would be unreasonable to assume that the legislature intended that the 2-year limitation could be evaded simply by adding to, or subtracting from, the area an acre or two. On the other hand, it would be equally unreasonable to attribute to the legislature an intent to shackle all annexations to the degree that no part of such area could be included in a second subsequent annexation proceeding for 2 years. What the legislature intended lies between these two extremes. The problem of statutory construction raises, therefore, the question as to what change in the boundaries of an area once rejected for annexation will justify, within the statutory 2-year period, the entertainment of a second petition for annexation.

The Texas Court of Civil Appeals, in applying a similar statute, has held that a *material* change in the boundaries of an area once rejected for annexation justifies a second annexation proceeding although the statutory period has not expired.[2] In view of the remedial purpose of annexation statutes the *material-change* rule seems sound if it is understood to require that the annexation area, as changed, will present to the voters a substantially different territory for consideration. We conclude therefore that the 2-year ban of § 413.12, subd. 5, upon the entertainment of a subsequent annexation petition does not apply if the boundaries of an area once rejected for annexation by the voters are in such subsequent proceeding so materially changed as to present to the voters a substantially different territory for annexation. Although a change in the boundaries may not eliminate a substantial overlapping of the old and the new annexation areas, it may nevertheless be suffi-

---

[2]Rachford v. City of Port Neches (Tex. Civ. App.) 46 S. W. (2d) 1057; Couch v. City of Fort Worth (Tex. Civ. App.) 287 S. W. (2d) 255.

ciently extensive if the area is substantially modified by the addition of new, or the subtraction of old, territory.

In the light of the above rule the trial court erred in finding that the combined effect of the north and south annexations was so substantially similar to the effect of the prior 1956 proceeding that both annexations are invalid under § 413.12, subd. 5. An examination of the record, as well as the exhibits, indicates that the south proceeding encompassed 2,186.15 acres and that only about 262 acres thereof (approximately 12 percent) were included in the 1956 petition. The north proceeding involved a total of 1,239.63 acres and about 423 acres thereof (about 34 percent) were included in the 1956 petition. Even if we assume as the trial court did that the north and south proceedings constituted a single annexation, it is clear that the two thus combined included only about 20 percent of the area encompassed by the 1956 petition. The record clearly compels a finding that the 1957 north and south petitions, whether considered separately or taken together as a single unit, presented for the consideration of the voter an area substantially different from that involved in the 1956 annexation proceeding. It follows that the 2-year ban of § 413.12, subd. 5, has no application.

■ In passing on the basic issue of whether the annexed territory is *so conditioned as properly to be subjected to city government*,[3] it must be borne in mind at the outset that we are here concerned with territory lying wholly within the metropolitan area of St. Paul and Minneapolis. The evidentiary factors indicative of a proper conditioning of a territory

---

[3]Although § 413.12, subd. 1, does not expressly require that annexed territory shall be *so conditioned as properly to be subjected to city government*, the requirement has long been recognized by our decisions as an implied prerequisite for original incorporation and annexation territory. L. 1949, c. 119, § 111, amended § 413.12 by deleting therefrom all references to villages. The same act, L. 1949, c. 119, §§ 1 and 7, enacted separate sections applicable to villages only. The new sections (now §§ 412.011, subd. 1, and 412.041) gave express recognition to the requirement that territory must be properly conditioned for annexation to a village. The decisions of this court antedating the 1949 act are still applicable to §§ 413.03 and 413.12. See, State ex rel. Danielson v. Village of Mound, 234 Minn. 531, 544, 545, 48 N. W. (2d) 855, 864.

for original incorporation or annexation in a distinctly rural[4] or mining[5] section of the state may have little or no significance in a metropolitan area case.[6] For example, the bisection of an annexation territory in a metropolitan area by a railroad track, whether it be on the level, depressed, or elevated, is of little significance as a basis for a finding of an improper conditioning if it otherwise appears that in the reasonably foreseeable future the area will be engulfed by a burgeoning or onward-marching urban population. If the need arises, the means will usually be found to live with and to cross railroad tracks. In a metropolitan area, suburban development is rarely stopped by tracks or highways. Likewise, low or swamp land, in the absence of *competent* testimony that it is impracticable to reclaim it, is not indicative of improper conditioning for annexation since, with the aid of modern dirt-moving machinery, it will, as the need arises, be filled and occupied for industrial, residential, or recreational use. The pressure of a rapidly growing urban population abhors the vacuum unoccupied space.

In applying the longstanding principle that not only territory included in an original incorporation but also territory to be annexed to an existing municipality must be "so conditioned as properly to be subjected to village government,"[7] it is obvious that the essential element of a compact center or nucleus of population[8] need not be found in the annexed territory itself since it is ordinarily contained within the annexing village or city.

The test as to whether the annexation territory as a whole is so conditioned as properly to be subjected to the government of the city of White Bear Lake embraces three basic essentials; namely, (1) that the

---

[4]See, State ex rel. Township of Copley v. Village of Webb, 250 Minn. 22, 83 N. W. (2d) 788.

[5]See, State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 149 N. W. 951.

[6]See, State ex rel. Northern Pump Co. v. Village of Fridley, 233 Minn. 442, 47 N. W. (2d) 204.

[7]State ex rel. Smith v. Village of Gilbert, 127 Minn. 452, 456, 149 N. W. 951, 953.

[8]State ex rel. v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755; State ex rel. Township of Copley v. Village of Webb, 250 Minn. 22, 28, 83 N. W. (2d) 788, 793.

platted portion of the lands contains a compact center or nucleus of population, (2) that the adjacent unplatted lands are suburban in character, and (3) that the unplatted lands have with the platted portions of the annexing city a unity of interest in the maintenance of a city government.[9] Since the first of these essentials is supplied by the annexing city of White Bear Lake, we are here concerned with the other two.[10] We shall consider the south annexation area first. The majority of its residents are concentrated in the eastern portion in Sunrise Park, an area consisting of 240 platted acres and a population of 1,980. Most of these people established their homes in or near Sunrise Park during the past 5 to 8 years and are employed for the most part in St. Paul or Minneapolis. The record is replete with evidence that Sunrise Park and its environs are suburban in character and have a unity of interest with the city of White Bear Lake in the maintenance of government. It is largely immaterial that the residents are for the most part employed in Minneapolis and St. Paul and that they do not obtain all professional services or do all their shopping in the city of White Bear Lake. It is enough that the latter city provides for them a compact center or nucleus of population through which their social, community, and civic activities find normal expression.

Since it is normal for a large percentage of metropolitan-area residents to reside outside the boundaries of a large city where they are employed, it would be unrealistic to infer from that circumstance that the locale of their residence does not qualify as a suburban area which has a unity of interest with an adjoining municipality in the maintenance of village or city government. The fact that a substantial part of their commercial patronage may go to St. Paul and Minneapolis is of no particular significance since it is customary for suburban residents to take advantage of the convenience of doing part of their shopping where they are employed, or in a large neighboring city which may

[9]State ex rel. v. Minnetonka Village, 57 Minn. 526, 533, 59 N. W. 972, 974, 25 L. R. A. 755, 759; State ex rel. Township of Copley v. Village of Webb, 250 Minn. 22, 28, 83 N. W. (2d) 788, 793.

[10]The burden-of-proof rule will not be repeated here since it is set forth in State ex rel. Township of Copley v. Village of Webb, 250 Minn. 22, 23, 24, 83 N. W. (2d) 788, 790.

offer a greater variety of merchandise. In fact we have held that a suburban area may be properly conditioned for village government even though it has no commercial or business center but only a nucleus of dwellings.[11] The Sunrise Park area, which has in fact a shopping center of its own, not only adjoins but is naturally connected with the city of White Bear Lake as a convenient and normal source for much of its shopping needs and for the usual municipal services and conveniences such as schools, water, sanitation, gas, electricity, and police and fire protection.

■ The unplatted area to the south of Sunrise Park and east of the railroad tracks appears from the record to be in a gradual and definite transition from rural to urban use. Land which is in the process of being presently, or in the reasonably foreseeable future, overflowed with the expanding population of nearby urban areas, as indicated by the existence of a more or less scattered development of small tracts and homes primarily used or intended for residential living, as distinguished from dwellings which are primarily accessory to the operation of bona fide farms, is suburban. This unplatted area is contiguous to the city of White Bear Lake and, like Sunrise Park, is properly conditioned for annexation.

Although the south annexation area to the east of the railroad tracks appears from the record to be properly conditioned for annexation, we have a different situation with that part of the south territory lying west of the railroad tracks. The area is occupied by 25 or 30 farms. Seventy-five percent of the farmers depend on their farm acreage as their sole livelihood. Two hundred acres consist of a slough and is therefore unoccupied and there is no evidence of any suburban development in its vicinity indicative of its reasonably early reclamation. Eight hundred acres appear to be primarily agricultural land with a population of only 160. Although conditions may quickly change, there is now no indication that the area is likely to be developed in the reasonably near future for urban living. Unlike the situation in State ex rel. Northern Pump Co. v. Village of Fridley, 233 Minn. 442, 47 N. W. (2d) 204, the area

---

[11]State ex rel. Burnquist v. Village of St. Anthony, 223 Minn. 149, 154, 26 N. W. (2d) 193, 196.

has had no rapid or significant increase in residential population. In fact during the past eleven years only five or six new residences have been built. In the southeast part of this area is a small business center where the residents do most of their shopping. Although fire protection is obtained from the city of White Bear Lake on a contract basis, police and road service is obtained from Ramsey County. Upon the record the trial court must be sustained in its conclusion that the west area is not suburban in character and has no unity of interest with the platted portion in the city of White Bear Lake or with the platted area of Sunrise Park in the maintenance of city government. Since the western portion of the south annexation area is not so conditioned as properly to be subject to the government of the city of White Bear Lake, the entire south area fails to qualify for annexation.

Is the north petition area as a whole properly conditioned for annexation to the city of White Bear Lake? One-third of its 1,240 acres is platted and two-thirds is unplatted. The platted portion includes a long-established residential area contiguous to the city of White Bear Lake. As part of the annexation territory the record shows an easterly area of about 320 acres with 575 people, a middle 320 acres with 625 people, and the westerly 320 acres with a population of only 85. By the uncontradicted testimony of a 50-year resident, who has been clerk of White Bear Township for 30 years, it appears that the westerly 320 acres are practically all devoted to farming. The trial judge, who visited the area, found such westerly portion, with the exception of the southeast corner, consisted nearly entirely of farms. Although the fact that the majority of the residents of the north annexation territory are employed in St. Paul and Minneapolis justifies an inference that they are not engaged to any appreciable extent in farming as the source of their livelihood, this inference has no application to the westerly 320 acres. Furthermore, there is no evidence whatever to show that the westerly tract is being approached from any direction by the onward march of an expanding residential population or that it is likely to be so approached in the reasonably foreseeable future—except in the general sense that the entire metropolitan area will eventually become suburban in character. In fact the record contains no evidence of any recent housing development in the north area as a whole.

Lest there be misunderstanding we observe, however, that if, contrary to the present evidence, it were to appear that the western tract was about to enter the process of being transferred into a suburban residential area, it would be properly conditioned for annexation even though it contained agricultural land.[12] As the evidence now stands the western tract is definitely not suburban in character and is therefore not so conditioned as properly to be subject to the government of the city of White Bear Lake. There is also little evidence that the residents of this westerly area have a unity of interest with that city in the sense of having a reasonable need for the services of city government or that they would derive advantages commensurate with their share of the resulting special taxes.[13] Since the westerly 320 acres are clearly not suburban in character the north annexation area *in its entirety,* under our present archaic annexation procedures, fails to qualify for annexation as not being so conditioned as properly to be subjected to city government.

Since it is apparent that future proceedings are likely to be undertaken to secure the annexation of large portions of the territories embraced by the north and south petitions, and that more litigation may result, we shall dispose of the other issues raised by this appeal.

 There is no merit in the contention that the south annexation is invalid on the ground that the petition was not verified by at least three of the petitioners as required by § 413.12, subd. 2. No showing has been made that because of this departure from the statute the election did not result in a fair and free expression of the will of the voters upon the merits. Although it is the general rule that, *before an election is held,* statutory provisions regulating the conduct of the election will usually be treated as mandatory and their observance may be insisted upon and enforced,[14] it is otherwise after the election has

---

[12]See, State ex rel. Northern Pump Co. v. Village of Fridley, 233 Minn. 442, 449, 47 N. W. (2d) 204, 209.

[13]See, State ex rel. Burnquist v. Village of Leetonia, 210 Minn. 404, 411, 298 N. W. 717, 721; State ex rel. Hilton v. Village of Buhl, 150 Minn. 203, 207, 184 N. W. 850, 851.

[14]See, Ferguson v. City of Morris, 197 Minn. 446, 267 N. W. 264; 18 Am. Jur., Elections, § 206.

been held.

"* * * *After an election has been held,* the statutory regulations are generally construed as directory[15] and such rule of construction is in accord with the policy of this state, which from its beginning has been that, in the absence of fraud or bad faith or constitutional violation, an election which has resulted in a fair and free expression of the will of the legal voters upon the merits will not be invalidated because of a departure from the statutory regulations governing the conduct of the election except in those cases where the legislature has clearly and un-equivocally expressed an intent that a specific statutory provision is an essential jurisdictional prerequisite and that a departure therefrom shall have the drastic consequence of invalidity." In re Order of Sammons, County Superintendent of Schools, 242 Minn. 345, 350, 65 N. W. (2d) 198, 202.[16]

It is well established that irregularities in the conduct of an election to annex land to a city, in the absence of a showing that they prevented a free expression of the voters on the merits, will not invalidate the election.[17]

■ The trial court erred in concluding that the south petition is invalid on the ground that it includes land more than one and one-half miles from *that part of the city limits upon which the annexation terri-tory abuts.*

---

[15]See, State ex rel. Maffett v. Turnbull, 212 Minn. 382, 385, 3 N. W. (2d) 674, 676; 18 Am. Jur., Elections, § 206; Annotation, 90 A. S. R. 72.

[16]See, In re Contest of Election of Vetsch, 245 Minn. 229, 238, 71 N. W. (2d) 652, 658; Taylor v. Taylor, 10 Minn. 81 (107); McEwen v. Prince, 125 Minn. 417, 147 N. W. 275; Schweigert v. Abbott, 122 Minn. 383, 142 N. W. 723; Clayton v. Prince, 129 Minn. 118, 151 N. W. 911; Ferguson v. City of Morris, 197 Minn. 446, 267 N. W. 264; 6 Dunnell, Dig. (3 ed.) § 2960; In re Special Election in School Dist. No. 68, 183 Minn. 542, 237 N. W. 412. We have not overlooked State ex rel. Hilton v. Village of Kinney, 146 Minn. 311, 178 N. W. 815, and State ex rel. Diepenbrock v. Gates, 35 Minn. 385, 28 N. W. 927.

[17]Cipowski v. City of Calumet City, 322 Ill. 575, 153 N. E. 613; see, State ex rel. Grozbach v. Common School Dist. No. 65, 237 Minn. 150, 159, 54 N. W. (2d) 130, 136; Green v. Independent Consol. School Dist. No. 1, 252 Minn. 36, 89 N. W. (2d) 12.

Section 413.12, subd. 1, provides that:

"Any territory * * * adjoining any city * * * and no part of which territory is more than one and one-half miles *from the present limits* of the city which it adjoins, may be annexed to such city * * *." (Italics supplied.)

The only condition prescribed by the legislature in the above section is that all annexed area must be within one and one-half miles from the present city limits and no qualification was added that all annexed area must also be within one and one-half miles from the place of abutment. When the statutory language is clear, qualifications cannot be added by construction.[18] It follows that the one and one-half miles is to be measured as the crow flies and it is immaterial that the line of measurement may pass over territory not included in the annexation.[19]

This case vividly illustrates the inequities and the inflexibility of the present statutory procedures for the annexation, or the original incorporation, of suburban territory within a large metropolitan area. Although the testimony herein clearly demonstrates that large portions of the annexation territory are properly conditioned for the benefits of municipal government, both annexations fail completely because once an annexation proceeding has begun, our statutes make no provision for a separation of improperly conditioned territory from that which is properly conditioned for city government. Much good can be accomplished by amending our statutes to provide that, *before a proposed annexation is submitted to the voters for their consideration,* a hearing, upon due notice, be first held before an administrative commission to determine if improperly conditioned territory has been included, and

[18]E. g., State ex rel. Harrier v. Village of Spring Lake Park, 245 Minn. 302, 71 N. W. (2d) 812; Griswold v. County of Ramsey, 242 Minn. 529, 65 N. W. (2d) 647; Peterson v. Halvorson, 200 Minn. 253, 273 N. W. 812; 17 Dunnell, Dig. (3 ed.) § 8938.

[19]Is an otherwise valid annexation invalid if the township from which the annexed territory is taken is left irregularly shaped or divided into a noncontiguous part? See, Donohue v. Village of Fox Point, 275 Wis. 182, 81 N. W. (2d) 521; Town of Blooming Grove v. City of Madison, 275 Wis. 342, 81 N. W. (2d) 721.

to give consideration to the conflicting claims of rival municipalities seeking to annex the same territory. The present hit-and-miss annexation procedures result in a gerrymandering of suburban areas which makes long-range planning both difficult and expensive. It seems desirable that annexation—or original incorporation—of territory can best be supervised by a part-time administrative commission composed of impartial persons who are familiar with the problems of towns, villages, cities, and metropolitan areas.

The orders of the trial court are affirmed. Let a writ of ouster issue. Affirmed.